STATE of Missouri, Respondent,

v.

Dimmon SHAW, Appellant.

No. 41596.

Missouri Court of Appeals,
Eastern District,
Division Three.

June 24, 1980.

John Ashcraft, Atty. Gen., Paul Robert Otto, Asst. Atty. Gen., Jefferson City, George A. Peach, Circuit Atty., Gary W. Brandt, Asst. Circuit Atty., St. Louis, for appellant.

Ernest L. Keathley, Jr., St. Louis, for respondent.

REINHARD, Judge.

Defendant was charged in an indictment with second degree murder and was convicted by a jury of manslaughter. He was sentenced under the Second Offender Act to a term of ten years in the Missouri Department of Corrections.

On appeal, defendant raises one point of error for our consideration. He contends that the trial court erred in overruling his motion for judgment of acquittal because the state's evidence was insufficient to support the jury's verdict.

The deceased, Earl Ashford, was killed March 18, 1978. The results of an autopsy performed by the medical examiner revealed that the deceased was struck by two, either .22 or .25, caliber bullets. One bullet struck the deceased "in the left upper chest near the midline, about two inches to the left of the midline." This bullet punctured the heart and was found in the right plural cavity. The second bullet struck the deceased "below the chest wall in the left upper quadrant of the abdomen" approximately three inches to the left of the midline. This bullet passed through the liver and embedded itself in the muscle tissue between the eleventh and twelfth ribs on the right side of the deceased's body. Both bullets traveled approximately on a horizontal plane through the body "slightly from left to right."

The deceased lived with his wife, Hazel, and her two sons by a previous marriage, defendant Dimmon Shaw and Robert Shaw, who is retarded. Frank Lagamarsino also lived at the Vernon Avenue address, occupying the third floor of the three story house. The shooting occurred on the second floor.

Although a drawing of the second floor was made on a blackboard for the jury, we do not have such drawing before us. We are forced to rely upon the vague testimony of Hazel and a limited view of some photographs for our description of the second floor. From her testimony, it appears that there were four rooms and a bathroom on the second floor. The deceased and Hazel occupied the bedroom at the southwest corner of the house. The doorway to this room faced out onto a hallway. To the left and north of the entrance to Earl and Hazel's bedroom was a refrigerator. The entrances to the bathroom and Robert's room were also north of Earl and Hazel's room on the west side of the hallway. Defendant's bedroom was on the northeast corner of the floor and the entrance to his bedroom was almost opposite the entrance to Earl and Hazel's bedroom. Located to the south of the entrances of these two rooms was a stairway leading down to the first floor.

At trial, only Hazel and Frank testified as to what occurred. Hazel stated that she, Earl, Frank and Robert were watching television in Earl and Hazel's bedroom. Hazel and Earl verbally quarreled about Hazel's sitting posture. At one point during the argument, the defendant entered the room. Hazel stated that the defendant smiled and then left the room and went into the bathroom. Earl and Hazel then went to the

refrigerator to get some water. The opened refrigerator door blocked the exit from the bathroom and, therefore, the defendant being unable to leave, stood for some time looking over the refrigerator door. He and Earl began shoving the refrigerator and bathroom doors back and forth. Defendant finally emerged from the bathroom and he and Earl continued struggling, eventually falling across the bed in defendant's room.

At this point, Hazel intervened and told Earl, who was on top of defendant, to get up. Earl complied and left defendant's room with Hazel. The two stopped in the hallway about halfway between defendant's and their rooms. Hazel testified that as she stood in the hallway, she could see all of the rooms. After standing in the hall for approximately five or ten minutes, Hazel heard the shots.

She did not see who fired the shots. She did not see anyone with a weapon before or after the shooting, including her son Robert. To the best of her recollection, Frank was in her and Earl's bedroom. Hazel did not know where Robert was located.

Hazel did not remember seeing defendant after the shooting. The last time she remembered seeing him was when she and Earl left defendant's room prior to the shooting. However, she did say that prior to the shooting "it seemed to me that Dimmon came out beside of us and went down. I am not sure. I just have to say I don't know. It seems like he came by us while we were standing there. I don't know."

Hazel further revealed that a few months before Earl's death, he was shot in the foot or leg while in front of their house but the identity of the person who shot Earl was never discovered.

Frank testified that defendant entered Hazel and Earl's bedroom. Earl and defendant began arguing. The defendant and Earl then went into the hall where they continued the argument. Although Frank could not see into the hall from where he was watching T.V., he stated he heard loud words and talk and heard someone fall and concluded from these sounds that a fight was in progress between the two men. Frank later heard two shots and saw Earl stumble into the bedroom. He did not see defendant with a gun. In fact, after defendant left Hazel and Earl's bedroom arguing with Earl, he was not seen again by Frank. After the shooting, Frank heard some unknown person go down the steps. Frank thought the shots came from the hallway.

 On appeal, when a defendant challenges the sufficiency of the evidence, we must consider the evidence and all favorable inferences to be drawn therefrom in the light most favorable to the state and evidence and inferences to the contrary must be disregarded. *State v. Franco*, 544 S.W.2d 533, 534 (Mo.banc 1976), *cert. denied* 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275 (1977). Where, as here, the state's case rests primarily upon circumstantial evidence, "the facts and circumstances must be consistent with each other and with the hypothesis of defendant's guilt, and they must be inconsistent with his innocence and exclude every reasonable hypothesis of his innocence." *State v. Ramsey*, 368 S.W.2d 413, 416 (Mo.1963). However, "the circumstances need not be absolutely conclusive of guilty, and they need not demonstrate impossibility of innocence." *State v. Thomas*, 452 S.W.2d 160, 162 (Mo.1970). Nevertheless, the evidence will be insufficient to support a conviction if it does not preclude a reasonable hypothesis of innocence. *State v. Biddle*, 599 S.W.2d 182 (Mo.banc 1980). "Mere suspicion, however strong, will not supply the place of evidence when life or liberty is at stake." *State v. Bunton*, 453 S.W.2d 949, 953 (Mo.1970), *quoting from State v. Jones*, 106 Mo. 302, 17 S.W. 366, 369 (1891).

██ Ordinarily, the testimony of a single witness may be considered sufficient although the testimony may be inconsistent. Inconsistencies in the testimony are questions for the jury. *State v. Hodges*, 537 S.W.2d 886, 887 (Mo.App.1976). However, the inconsistencies in the testimony of a single witness going to a vital and material

issue in the case will be scrutinized closely by the court in determining whether or not such testimony constitutes substantial evidence. Cf. *State v. Longmeyer*, 566 S.W.2d 496, 500 (Mo.App.1978); *State v. Washington*, 383 S.W.2d 518, 521 (Mo.1964).

▮ The state presented no direct evidence linking the defendant to the crime. At best, the direct evidence establishes that defendant was in the house, had a motive, and may have had an opportunity to kill Earl, but does not show that he fired the fatal shots. We do not believe that this evidence is sufficient to support the conviction. *See State v. Arnold*, 566 S.W.2d 185, 189 (Mo.banc 1978).

▮ The state argues that the defendant's guilt is proven by the circumstantial evidence presented in the case. The state relies primarily upon the position of the deceased in the hall, the last known position of the defendant, the trajectory of the bullets and points at which they struck the deceased, and their subsequent course through the body. This circumstantial evidence, asserts the state, supports the theory that "the bullets could only have come from where the appellant was last seen." We disagree.

The state offered into evidence two photographs of the body of the deceased. State's exhibit C is a frontal view of the body and it clearly sustains the medical examiner's testimony that the entrance wounds were slightly left of the midline. State's exhibit 7 is a view of the body taken from the left front. It also reveals no entrance or exit near the direct left or left rear of the deceased's body.

The state contends that these entry wounds were consistent with the location of deceased at the time of the shooting in relation to the entrance to defendant's bedroom. Hazel stated that she was facing into her bedroom and could also see the other rooms on the second floor. She testified that Earl was to her right, facing into their bedroom with his back and left side to defendant's room. The state concedes that Hazel's testimony indicates that the deceased was standing with his left side and back towards defendant's room.[1]

---

1. Hazel's testimony as to the location of the deceased is as follows:

Q. All right. Where would your husband have been; in other words, what position was he in?
A. He had been standing kind of corner to us, my son's room, facing me toward my son's room.
Q. Would I be correct in saying the way your're describing it for the record, his left side would be toward Dimmon's room?
A. No, his back was to his room.
Q. All right. His back and which side, if any, would be closest to Dimmon's room?
A. It would be on the—He was kind of turned sideways, so it would be mostly on this side.
Q. Mostly on your left you're indicating?
A. Yeah, his back.
(Cross examination)
Q. Well, would it be better to say it was like this and Mr. Ashford was also facing towards your bedroom?
A. That's right.
(Redirect examination)
Q. You also indicated that Mr. Ashford was to your right as you were coming from Dimmon's room over to yours, is that correct?
A. That's correct.

Q. So that his back would have been generally toward this area and your back would have been generally toward this area, is that substantially correct?
A. Both of our faces was facing my bedroom mostly.
Q. All right. So generally his left side and back would be toward Dimmon's room and your left side would be toward your room, is that right?
A. That's right.
Q. Okay. And you would have been looking in this direction and Mr. Ashford would have been looking toward you this way, is that right?
A. Yeah, we both was facing my bedroom mostly.
(Recross examination)
Q. And which way was Mr. Ashford looking at the time the shots were fired?
A. I don't know. I imagine he was looking in toward me. I don't know.
Q. Okay. Then, was Mr. Ashford facing your bedroom then?
A. He was. Mostly he was facing my bedroom. We both was.
Q. Okay. And Dimmon's room was right behind him, is that correct?
A. That's right.

This circumstantial evidence of Earl's position in the hallway, the trajectory of the bullets, and the points of impact on Earl's body, cannot support the theory that the weapon was fired from the defendant's bedroom. It would have been physically impossible for the bullets to be fired from defendant's room and strike the deceased in the chest and side as they did. The evidence (Earl's position, the line of the bullets, and the point of impact) is consistent with a theory that the bullets were fired from the hall or stairway. Since defendant was last seen in his bedroom according to the state's theory,[2] the evidence of a weapon being fired from the stairway or the hallway is consistent with the reasonable hypothesis of his innocence and, as such, the state's evidence is insufficient to sustain the conviction.

Because the evidence is insufficient to sustain the conviction, the judgment must be reversed outright. *Burks v. United States*, 437 U.S. 1, 11, 98 S.Ct. 2141, 2147, 57 L.Ed.2d 1 (1978); *State v. Basham*, 518 S.W.2d 518, 521 (Mo.banc 1978); *State v. Inman*, 578 S.W.2d 336, 338 (Mo.App.1979).

Accordingly, the judgment of the circuit court is reversed and the cause is remanded with directions to discharge the defendant.

DOWD, P. J., and CRIST, J., concur.

---

2. At one point in her testimony, Hazel did state that defendant may have gone past them in the hallway and down the stairs, but she qualified her answer by stating that she really did not know. This testimony is not probative of the fact of whether the defendant actually went downstairs after he fought with Earl. *See Bak-* *er v. Brinker*, 585 S.W.2d 256, 258 (Mo.App. 1979). Furthermore, even if it were probative, it would be insufficient to sustain the conviction because the state presented no evidence which showed that defendant ever came back up the stairs and fired the shots.