**STATE of Missouri, Respondent,**

v.

**Julia BLACK, Appellant.**

**No. 41714.**

Missouri Court of Appeals,
Eastern District,
Division Four.

Nov. 25, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 16, 1981.

Application to Transfer Denied
March 9, 1981.

Charles Shaw, Shaw, Howlett & Schwartz, Ronald Kaden, Clayton, for appellant.

John Ashcroft, Atty. Gen., Paul R. Otto, Asst. Atty. Gen., Jefferson City, George Westfall, Pros. Atty., Clayton, for respondent.

SMITH, Presiding Judge.

Defendant appeals from her conviction of second degree murder by a jury and resultant ten-year sentence imposed by the court under the second offender act.[1] We reverse.

Defendant has raised five points of error, but it is necessary for us to discuss only one—the failure of the trial court to sustain her motion of acquittal at the conclusion of the evidence. We review the evidence presented by the state and view it in the light most favorable to the state and draw from it permissible inferences. We will on occasion make reference to evidence presented by the defense but do not base our conclusion upon such evidence unless favorable to the state.

Joe Black, defendant's husband, was killed from a single blast of a shotgun in the early morning hours of January 27, 1978, while in his home. A police officer, who arrived shortly after the killing, found defendant in the living room crying and hysterical and the dead body of Joe Black in the kitchen. Defendant stated: "I shot him. It was an accident. I was just handing him the gun."[2] The officer located a single-barrelled shotgun leaning against a wall in a nearby bedroom. He searched for, but was unable to find, any spent shells or wadding from a shotgun. This search included the snow covered area between defendant's home and her neighbor's residence. At some time while the officer was in the residence defendant fainted. She was taken to the hospital. After leaving the hospital defendant made a statement to the police following waiver of her Miranda warnings. An officer testified that in that statement she gave the following account:

"She was helping her husband to get ready, pack his things to go hunting; that she went to the living room to retrieve the shotgun, brought it into the kitchen where he was standing, handed the gun to him; as he reached out to grab the gun, it discharged and she had no idea how it discharged. From that point, she stated that she didn't remember anything else other than dropping the gun and running outside of her house to the next-door neighbor."

As decedent's body was removed a spent shotgun shell was found under it. Two days after the shooting police returned to the house to obtain a second shotgun that they believed to be on the premises. A double-barrelled shotgun was found under a bed by defendant's nephew and turned over to the police. Defendant was present and, as with all her other contacts with the police, was fully cooperative. Subsequent

---

1. The prior offenses involved carrying of concealed weapons.

2. The next door neighbors, who appeared as defense witnesses, testified that defendant ap-

peared at their home, in her nightclothes, barefooted and carrying a shotgun, in an hysterical state requesting help because she had "accidentally shot her husband."

ballistics tests established that the spent shell was fired from the double-barrelled shotgun. By measurement the police established that the hole in decedent's shirt caused by the shotgun blast was 3 inches by 4.5 inches.

The medical examiner testified that the hole in decedent's body from the blast was 2 inches by 3 inches. In addition there was a superficial wound on decedent's arm caused by grazing from the shotgun blast, and approximately 50 pellets or pellet marks covered an area 6 by 8 inches near the main wound. The pellets causing these marks were referred to as "fliers." The pellets entering the main wound took a slightly downward course through the body striking the lower ribs, heart, lungs, diaphragm, kidney, spleen, stomach, and pancreas. None of the pellets exited the body. Death resulted from massive bleeding of the heart and lungs, and the bleeding outside as well as inside the body was massive. The medical examiner said the wound suggested that decedent was upright but because of variation in actions of the pellets once they entered the body this was not certain. Decedent's blood contained .284% alcohol which would have "considerably" affected his reflexes.

An expert witness for the state testified that he conducted tests with the single-barrelled shotgun by firing from various distances at pieces of cloth fastened to cardboard. From these firings he opined that to achieve the pattern which caused the hole in the shirt the muzzle of the shotgun would have had to be 18 to 20 feet distant from the shirt. He made his shots solely from a 90° angle, no other angles were attempted. He made no attempt to duplicate the smaller hole found in the body, nor

did he conduct firing tests with the double-barrelled shotgun. Without explanation he stated his belief that the hole in the shirt was a more accurate measurement of the shot pattern than the hole in the body.[3] He had no explanation of why the body hole was a third smaller than the shirt hole. He also testified that the trigger pull on the single barrelled shotgun was 3½ pounds which is lighter than average, and that he could not get that gun to discharge by dropping it and touching the side of the gun. He did not test it to see if he could cause it to fire by grabbing in the trigger area as the gun fell. He did not testify to any tests of trigger pull or accidental discharge for the double-barrelled shotgun.

Additional expert testimony was adduced that no powder burns or unburned powder were found on the shirt. The expert admitted that he did not know how the shirt was handled prior to receiving it, and admitted that heavy bleeding would make powder burns more difficult to detect. No chain of custody of the shirt was established but defendant raised no objection at any time to that.

No wadding from the shotgun was found either in the decedent's body or in defendant's residence.[4] There was testimony that it would normally be expected that on a close-in shot the wadding would follow the pellets into the target. It is also clear from the testimony that while this might be expected it is not inevitable.

No evidence was adduced during the prosecution's case, nor until the defendant testified, as to which shotgun the defendant said she was handling at the time decedent was shot. In her testimony she stated it was the single-barrelled shotgun which she was handing to her husband when the blast

3. This response was on cross-examination. Earlier on cross-examination he stated "both [measurements] would be accurate" of the pattern and he didn't have "any idea" what caused the discrepancy. Further on cross-examination he testified that the shirt hole would more accurately reflect "where the shot *fliers* entered the target." He admitted deflection of the pellets would have an effect on the pattern and that he was unaware that there had been a grazing of decedent's arm by the blast.

4. In her motion for new trial defendant presented affidavits that she found out after the trial that her nephew had found the wadding while cleaning up the kitchen and, being ignorant of what it was, threw it away. This was the basis for a request for a new trial on the grounds of newly discovered evidence.

occurred. Defendant repeated again her prior statements that she was handing her husband the gun, that she felt it falling, grabbed for it, and it discharged. No evidence was adduced by the prosecution that defendant and her husband had had any argument, disagreement, or fight nor was any evidence adduced to establish a motive for the killing of Joe Black. There was no evidence by the state to establish intoxication of the defendant. In fact, the defense evidence was to the contrary, although the witnesses did testify she had had something to drink during the evening. The defense witnesses further testified that defendant and her husband had had a particularly pleasant and amicable time together earlier in the evening.

An expert for the defense testified that the blast pattern in Joe Black's body was compatible with a test firing at two feet at an angle. He also testified that the hole in the shirt would not be as accurate as the hole in the body unless the shirt were tight fitting in which case the holes should be the same, and that a crease in the shirt which he saw in the picture of decedent's body would cause a larger pattern when the shirt was stretched out for measurement. There was also defense evidence to explain the absence of powder burns, the presence of the 50 fliers (out of between 225 and 275 pellets), and the absence of the wadding in the wound. The theory of the state on appeal is basically that, although it had no evidence of defendant having intentionally shot her husband, it did have evidence that she had either been mistaken or lied about certain facts and that certain presumptions arise from the fact that the victim was killed by a deadly weapon and from defendant's statement that she "accidentally shot" her husband.

 Second degree murder is established by showing a willful, premeditated killing of a human being with malice aforethought. *State v. Franco*, 544 S.W.2d 533 (Mo. banc 1976) cert. den. 431 U.S. 957, 97

S.Ct. 2682, 53 L.Ed.2d 275 (1977). It is the burden of the prosecution to establish beyond a reasonable doubt that defendant intended to kill or inflict serious bodily harm. *State v. Helms*, 559 S.W.2d 587 (Mo. App.1977). Intent may be inferred from the circumstances of the case. *State v. Gillam*, 588 S.W.2d 13 (Mo.App.1979). In *State v. Shuler*, 486 S.W.2d 505 (Mo.1972) the court stated the proper evidentiary standard as follows:

"General criminal intent is found 'when from the circumstances the prohibited result may reasonably be expected to follow from the offender's *voluntary* act, irrespective of any subjective desire to have accomplished such result.'" (l. c. 509) (Emphasis supplied). (Quoting from 22 C.J.S. Criminal Law Sec. 35, quoted with approval in *State v. Anderson*, 384 S.W.2d 591, 607 (Mo. banc 1964)).

The state premises the sufficiency of the case upon a series of cases which state that where the evidence shows a killing by the use of a deadly weapon upon a vital part of the body, second degree murder is presumed. *State v. Tourville*, 295 S.W.2d 1 (Mo.1956); *State v. Enlow*, 536 S.W.2d 533 (Mo.App.1976); *State v. Ward*, 569 S.W.2d 341 (Mo.App.1978); *State v. Eldridge*, 554 S.W.2d 422 (Mo.App.1977). Tracing back the authorities relied upon in those cases it appears that the basis for those holdings is the language from *State v. McCracken*, 341 Mo. 697, 108 S.W.2d 372 (Mo.1937):

"Where a homicide is *intentionally* committed with a deadly weapon used upon a vital part of the body and there is no witness to the occurrence, murder in the second degree is presumed in the absence of evidence to show a different grade of offense or that such killing was justifiable or excusable." (l. c. 374) (Emphasis supplied).

While intent may be inferred from the circumstances, the presumption of second degree murder does not apply unless the homicide was "intentionally committed."[5]

---

5. The validity of this presumption may be suspect. *See State v. Ayers*, 470 S.W.2d 534 (Mo. banc 1971); *State v. Stapleton*, 518 S.W.2d 292

(Mo. banc 1975). It certainly is if the evidence of "intentionally committed" is based solely upon evidence the killing was the result of a voluntary act.

The cases cited by the state have omitted this essential element in setting forth the rule enunciated in *McCracken, supra.* Each of the cases relied upon by the state and the cases cited therein, however, contained an abundance of evidence from which an intentional act could be inferred. Several involved claims of self-defense, which by definition includes an intentional act causing the death. Others involved arguments, fights, or disputes from which the intent could be inferred. We have been cited to no case, and have found none, in which a death attributable to a deadly weapon was, without more, presumed to be murder second degree. The standard set forth in the state's cases, if taken literally and out of the context of the facts of those cases, would eliminate the necessity of proving intent, malice or even voluntariness of the action resulting in death. That this is not the proper standard is illustrated by the dicta in *State v. Martin*, 364 Mo. 258, 260 S.W.2d 536 (1953):

"Defendant attacks this instruction for the reason, among others, that it predicates a presumption of intent to kill or do great bodily harm upon the mere 'use' as opposed to 'intentional use' of a deadly weapon. If this construction of the language used is correct, then indeed the instruction is, for that reason alone, erroneous. For whatever else may be said about instructions concerning presumptions of intent, it is at once obvious that the 'presumption' stated does not arise except it be predicated upon an intentional act." (l. c. 538).

■■■ It is also clear that the presumption advocated by the state would run afoul of the law concerning *corpus delecti*. In a homicide case the *corpus delecti* consists of two elements, first the death of a human being and second, the *criminal* agency of another in causing the death. These may be shown by circumstantial evidence, but are not established until it has been proved that the death was not self-inflicted nor due to natural causes or accident. *State v. Meidle*, 202 S.W.2d 79 (Mo.1947). The burden

to establish the *corpus delecti* is obviously upon the state. The *corpus delecti* cannot be presumed and must be proved by legal evidence sufficient to show that the crime charged has been committed by someone. *State v. Summers*, 362 S.W.2d 537 (Mo.1962) [12].

■■■ The state also contends that defendant's statements that she "accidentally shot" or "accidentally killed" her husband is an admission that she shot her husband from which arises a presumption of intention. While a jury may disbelieve any part of a witness' testimony, we do not believe her consistent position that the shooting was accidental can be converted into an admission that it was intentional in the absence of some evidence of that intention.

■■■ In addition, the statement of defendant that she "accidentally shot" her husband is subject at best to at least two equally valid inferences. One is that she intentionally shot the gun and accidentally hit and killed her husband. Under the above cases relied upon by the state that might be sufficient to support the conviction. But, the other inference is that she accidentally (meaning unintentionally) shot or, more properly, discharged the gun which killed her husband. Such an inference would not support a conviction. Where two equally valid inferences can be drawn from the same evidence, the evidence does not establish guilt beyond a reasonable doubt. *In re K. S. R.*, 585 S.W.2d 208, 210[3] (Mo. App.1979); *United States v. Kelton*, 446 F.2d 669, 671 (8th Cir. 1971).

Factually, the state offered evidence that Joe Black was killed by the double-barrelled shotgun. But, there was not one shred of evidence offered to establish that the shot pattern from the double-barrelled shotgun was inconsistent with defendant's claim of accident. No tests of firing patterns were apparently run on that gun, or if they were, were not offered in evidence. Nor, was any test made to determine if that weapon could be accidentally discharged by dropping. There was, in short, no proof that the

double-barrelled shotgun was discharged intentionally.

■ Alternatively, the state produced evidence that based upon its tests the single-barrelled gun, which the state tests determined was not the fatal weapon, could not be discharged accidentally by dropping and that it must have been fired 18 feet or more from the decedent. This evidence was apparently offered on the theory that the state could establish its case solely by proof of the inaccuracy of defendant's explanation. We have serious reservations that the state can carry its burden in such a fashion. The state has the burden of establishing each element of the offense beyond a reasonable doubt. This includes the element of intention and requires proof beyond a reasonable doubt that the killing was not accidental. See MAI–CR2d 2.28. It is not the defendant's burden to establish that the killing was accidental. It appears that here that is exactly the burden placed upon defendant, and the state attempted to carry its burden solely by refuting defendant's story. However, even if such an attempt by the state were permissible, the state's evidence does not refute defendant's explanation of the occurrence. It may be conceded that certain aspects of defendant's story were either mistaken or possibly fabricated. But, these erroneous aspects do not establish that she murdered her husband.

The state's test of dropping the gun and touching it on the side but not in the trigger area did not refute defendant's statement that she grabbed the gun as it was falling and that it discharged. The test did not duplicate the explanation of the occurrence given by the defendant. The pattern tests are similarly inconclusive. The hole in Joe Black's body was a third smaller than that in his shirt. The state offered no explanation for this phenomenon, although the state's evidence made clear that shotgun pellets diverge, not converge, after leaving the gun.

"Courts are reluctant to say that declared facts are manifestly impossible or untrue, [citation omitted] and should not indulge in arbitrary deductions from physical laws and facts except when they appear to be so clear and unrefutable that no room is left for the entertainment, by reasonable minds, of any other conclusion." *Leavitt v. St. Louis Public Service,* 340 S.W.2d 131 (Mo.App.1960) [1–3].

While courts are reluctant to make such a finding, it has been consistently held that:

"Testimony which is manifestly untrue, incredible, impossible, or contrary to scientific principles established by the laws of physics or mechanics does not amount to substantial evidence, has no probative value, and is to be disregarded." *Kelly v. Terminal Railroad Assn. of St. Louis,* 315 S.W.2d 699, (Mo.1958) [1]; *Stonefield v. Flynn,* 347 S.W.2d 472, (Mo.App.1961) [5].

The state's pattern tests were based upon the hole in the shirt which was substantially larger than the hole in the body. If the difference in hole size is attributable to "fliers" there is no indication that the holes in the test targets also included fliers. And, the evidence is clear that "fliers" are erratic and are increased by deflection, which was present here. In the absence of an explanation neither we nor the jury could attribute weight to the evidence of pattern which failed to duplicate the factual circumstances of the shotgun blast. The state failed to adduce any evidence to establish what distance the muzzle was from the body based upon the injury inflicted on the victim.

There was evidence that there was no burned or unburned powder on the shirt. There was no evidence of what distance would be required to leave unburned powder or powder burns on the shirt. There was evidence that at close range the wadding or shot cup from the shotgun would *normally* enter the wound. The expert who stated what "normally" happened was not aware of the grazing wound on the victim's arm and did not testify to what effect that would have on the "normal" happening. No wadding or shot cup were found in the body or elsewhere. The testimony concerning the wadding is the only evidence from

which a jury could find that the gun which killed Joe Black was located some distance from the body and that testimony was equivocal in indicating what normally happened, but not what happened here. This evidence is not sufficient in itself to establish murder second degree beyond a reasonable doubt.

 Our examination of the record convinces us that the state did not carry its burden of establishing that defendant intentionally killed her husband.

Judgment reversed and defendant ordered discharged.

SATZ and SIMON, JJ., concur.