STATE of Missouri, Respondent,

v.

**Steven Leon MAY, Appellant.**

**No. WD 35214.**

Missouri Court of Appeals, Western District.

Feb. 26, 1985.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied April 2, 1985.

Application to Transfer Denied May 29, 1985.

Robert F. Pyatt, Chillicothe, for appellant.

John Ashcroft, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before PRITCHARD, P.J., SHANGLER and BERREY, JJ.

SHANGLER, Judge.

The defendant May was convicted by a jury of the manslaughter of the eleven-month old infant Toshua Meeker and was sentenced to a term of imprisonment for six years. The defendant contends the evidence does not support conviction. We sustain the contention, and reverse the conviction and discharge the defendant.

The defendant May was the live-in consort of Norma Meeker, mother of the decedent, during a liaison of one month. The day before July 24, 1981, the infant Toshua fell from a chair to the lineoleum-covered hardwood floor and struck her head. She cried, but according to the mother and grandmother, there was no evident sequel except that "she had been sleeping a lot." On July 24, 1981, earlier, May, the mother and child, spent some time at the home of the parents of the defendant, where the child crawled and attempted to amble—all without apparent event.

The critical sequence of events commences with the return to the residence from a stroll uptown by Norma Meeker, mother of the eleven months infant Toshua, and the child, and Steven May the defendant and live-in consort for the past month. That was at about eight o'clock on the evening of July 24, 1981. When they arrived home, Toshua was placed in a playpen in the living room, the mother went into the kitchen to wash her hair, and defendant Steven commenced to paint the kitchen door. Steven was in sight of the mother and the mother could hear the infant jabbering. The child fell asleep within ten or fifteen minutes, and Steven carried her to the bedroom upstairs. The mother could hear his movement, and she testified that Steven remained upstairs "long enough to lay her down." He returned downstairs and resumed painting the kitchen door, and the mother continued to attend to her hair. Fifteen minutes later, Steven returned the child to the playpen. Once again, he was gone just "long enough to bring her down." The child was placed in the playpen, and she went back to sleep. The mother was still preoccupied with her hair, and the defendant was in a chair to smoke a cigarette. After some undisclosed time, Steven returned the child—still asleep—upstairs. He was upstairs again, "long enough to lay her down and come back down." The two adults remained in the living room entertained by the radio or television. It was hot, and Steven told her he was going upstairs "to check on her, and get a fan, and he went upstairs to check—he came back downstairs, and said 'something is wrong with Toshua.'" The mother ran up the stairs and found child unconscious. They sought assistance of a neighbor, but no one was at home, so

the mother remained with the child while Steven went for the help of his parents. An ambulance was summoned, and in the course of the transport to the local hospital, the mother of defendant, Mrs. May, attempted to revive the child with mouth-to-mouth resuscitation. The child remained unresponsive, however, as they arrived at the hospital.

Dr. David Ryan was the first physician to attend the infant. He was on duty at the local hospital when called to the emergency room when the child arrived. His examination detected bruises on the buttocks, perineum—the area between the genitalia and rectum—and a bruise between the eye and ear on the right side, extended into the hairline. The back of the head had a "soft mushy appearance." The bruises around the head as well as to the buttocks and perineum "all appeared to be about the same color, a brownish color"— an indication of healing. *It was his opinion that the bruises*—on the head and other parts of the body—*were all of the same age: "probably at least a couple of days old,"* or even older. [emphasis added] *He could give no opinion as to the cause of the mushiness on the back of the skull.* The witness attempted no opinion as to the cause of death. Thus, the testimony of Dr. Ryan tends to prove neither that the child suffered a blow to the head on that day— July 24, 1981—nor that the injury was caused other than by accident.

The child was that same evening transported to the Childrens Mercy Hospital in Kansas City in the company of Nurse Dalrymple. There she was seen by Dr. Julia Elrod. The child was still unresponsive and needed help to respire. Examination disclosed a spongy area from the right temple to above the ear, and also bruises to the buttocks and perineum. There also may have been some *very faint discoloration* about that particular area of the head, "but nothing real dramatic." Dr. Elrod diagnosed a possible fracture of the skull [later confirmed by a cat-scan X-ray], and diagnosed the condition of the child on the basis of *"unexplained trauma, or even unexplained ongoing trauma."*

The next morning, July 25, 1981, the child was examined by Dr. Julie Fall at the Childrens Mercy Hospital, and attended her until July 30, 1981, when she died. The child was still unresponsive to stimuli. She also noted the multiple bruises over the body of the child and a large swelling on the side of her head. Dr. Fall gave opinion that the death was caused by traumtic damage to the brain, but *could not say whether the trauma was a fall or a blow.*

The autopsy was performed by Dr. Bonita Peterson, Jackson County Medical Examiner. Her procedures noted brownish bruises around the anus and a spongy area on the right side of the head. There was a fracture 4½ inches long on the right side of the head and incision revealed a hemorrhage under the surface of the scalp on that side. The brain was swollen, but there was no contusion. In a fall, the Examiner explained, there is a contrecoup or ricochet effect so that any contusion is widespread. In a blow, on the other hand, the contusion is local to the area of impact. In this case, however, there was no contusion at all, so that *"we don't have that clue as to whether it was a fall, or a blow."* [emphasis added].

■ The corpus delicti of a homicide consists of two elements: the death of a human being and the criminal agency of another. Those elements are not established unless the proof shows that the death was not self-inflicted, nor from natural cause or accident. The proof of the corpus delicti alone, however, does not suffice for conviction: the prosecution evidence must show an additional element—a criminal act of the defendant as the cause of death. *State v. Applegate*, 668 S.W.2d 624, 628[3–6] (Mo.App.1984); *State v. Meidle*, 202 S.W.2d 79, 81[1–6] (Mo.1947). These elements of the substantive offense may be shown by direct or circumstantial evidence, but in either event, the prosecution bears the burden to prove the criminal agency of the defendant—and the subsumed element that the death was not from accident—beyond a reasonable doubt.

*State v. Morris*, 564 S.W.2d 303, 308[2–6] and n. 6 (Mo.App.1978). The prosecution case was wholly circumstantial. In assessment of the sufficiency of circumstantial proof, a court of review considers all the evidence and reasonable inferences in a light most favorable to the verdict, and disregards the unfavorable implications. To sustain conviction, the facts and circumstances must be consistent with each other and with the hypothesis of guilt, and must be inconsistent with innocence and exclude every reasonable hypothesis of innocence. *State v. Franco*, 544 S.W.2d 533, 534[1–4] (Mo. banc 1976).

There was no medical evidence as to the cause of death. There was no evidence that the mortal injury was administered by a human and that the defendant was that person. The proofs allow no clue, either to an expert or to a lay person as to the cause of death, except to choose between two equal possibilities—a fall or a blow. Where the evidence allows no more than equal support for either of two inconsistent inferences as to an ultimate and determinative fact, there is a failure of proof beyond a reasonable doubt. *United States v. Kelton*, 446 F.2d 669, 671 (8th Cir.1971); *State v. Prier*, 634 S.W.2d 197 (Mo. banc 1982); *State v. Black*, 611 S.W.2d 236 (Mo.App.1980). In terms of a homicide proceeding: prosecution medical evidence which shows without dispute that the death of the victim could have been caused equally by accident or by the criminal act of the defendant does not suffice to prove the criminal act. Anderson: Wharton's Criminal Law & Procedure § 324 (1957). In terms of the burden of proof, a submissible case is not made where the evidence is as consistent with innocence as with guilt. *City of Kansas City v. Oxley*, 579 S.W.2d 113, 115[2, 3] (Mo. banc 1979). In terms of a submission on circumstantial evidence, unless the evidence excludes every other reasonable hypothesis of innocence [as for instance, accident as the cause of death], the case is not submissible. *State v. Grey*, 525 S.W.2d 367, 369[1, 2] (Mo.App.1975).

This is not a disagreement with how the jury chose, and an insinuation of another inference of choice instead. A court of review must allow all legitimate inferences which the evidence fairly induces to stand. *State v. Selle*, 367 S.W.2d 522, 528 (Mo.1963). There was simply no basis for the choice that the cause of death was a blow to the head by the defendant rather than by accident, nor even a choice between evidence *pro* and *contra* for that inference. There was testimony only that the death was as likely the result of a fall [accident] as of an administered blow [a criminal act]. The inference that death was caused by a criminal act [upon which the conviction rests], however, can stand only if the proof shows "that the death was not self-inflicted, nor due to natural causes, or accident." *State v. Morris*, 564 S.W.2d 303, 309 (Mo.App.1978); *State v. Meidle*, supra, l.c. 81. Thus, the true cause of death remained a speculation, and was not proven by the evidence available to the jury. *State v. Prier* and *State v. Black*, supra; Anderson: Wharton's Criminal Law & Procedure § 324 (1954).

To be sure, the testimony of Dr. Peterson discounted that the fall from the chair the day before could have caused the fracture to the head. That conclusion, however, even if fact, neither eliminates another fall by accident at another time as the cause of death, nor establishes the probative inference that a blow by a human agent—the defendant himself—was the cause of death. That testimony does not meliorate the conclusion by Dr. Peterson that she could not tell from the autopsy examination "whether it was a fall, or whether it was a blow, that caused this injury." Moreover, the only substantial evidence as to the date of the incurrence of the head injury—by whatever means, accident or criminal agency—was not on July 24, 1981, but at least two days earlier. The bruises at the site of the head fracture as well as those at the perineum and buttocks were all faded and of the distinctive discoloration of bruises in the process of healing. They were, Dr. Ryan testified for the pros-

ecution, "basically about the same age … probably at least a couple of days old." That opinion of a trauma to the temple area incurred *before* July 24, 1981, was supported by yet another opinion of a prosecution expert, Dr. Julia Elrod, who diagnosed the condition of the child as observed on that very night, July 24, 1981, as from "unexplained trauma, or even unexplained *ongoing* trauma" [emphasis added]. The defendant is not charged, however, with death from an event two days, or any day, before July 24, 1981. Nor does the evidence suggest how the perineal and buttock bruises, contemporaneous to the temple bruise—and hence logically explainable as a connected event—came about. There was no attempt to elicit an explanation from the person most likely to know, the mother, a witness at the trial. What remains is simply a death unexplained as to cause, and hence, the corpus delicti and a conviction unproven.

 The prosecution argument slights this conspicuous void in the proof of the corpus delicti [that the death was from human agency rather than from accident] and of the substantive offense [that the defendant was the criminal agent]. The prosecution arches over the lack of that essential proof by the single circumstance: presence and opportunity to commit the offense. The prosecution argues that from the time of the return to the residence—at which time Toshua displayed no serious symptom—until the child was found injured, May exercised "sole control" over Toshua. Thus, that circumstance "eliminated the possibility that another committed the act and demonstrated that [defendant May] had the exclusive opportunity to have inflicted the injury." The law, however, is otherwise and peremptory: circumstantial evidence which shows that the accused had only opportunity, and even motive, to kill the victim does not suffice to support a conviction for homicide. *State v. Shaw*, 602 S.W.2d 17, 20[6, 7] (Mo.App. 1980). That is to say, circumstantial evidence that the accused was at the scene of the crime and so had opportunity does not constitute a sufficient nexus between the

defendant and the crime to sustain conviction. *State v. Arnold*, 566 S.W.2d 185, 189[9, 10] (Mo. banc 1978). That merely gives effect, once again, to the larger principle: "Where two equally valid inferences can be drawn from the same evidence, the evidence does not establish guilt beyond a reasonable doubt." *State v. Prier*, 634 S.W.2d 197, 200[3–5] (Mo. banc 1982).

The cases cited by the prosecution brief simply do not sustain the premise that circumstantial evidence of the quantum and quality presented at the trial establishes a nexus of culpability between the defendant May and the death of the child as a homicide. The prosecution cites recurrently *State v. Morris*, 564 S.W.2d 303 (Mo.App. 1978). That conviction for infanticide was sustained on circumstantial evidence that the live-in male sat with the baby during the entire time the mother was at work. It was that "exclusive custody," *in addition* to evidence that the defendant had physically abused the child in the presence of others, that the child suffered severe injuries and fractures on other occasions while in his custody. On the day of the death, the mother and consort spent some time in a local pub [with the victim in tow], on return to the residence, the child was laid on the bed, the mother left for an outside toilet, and the defendant was alone with the child for a full five minutes. On her return, she found the child in distress. The cause of death was a subdural hematoma and hemorrhage from an injury to the head. A police search of the premises discovered a large beer bottle near the bed. The pathologist gave opinion that the injury which caused death could have been inflicted by a blow with the bottle. A substance found on the pillow on which the child lay was consistent with dried beer. Strands of hair found on the beer bottle were similar to hair on the head of the infant. The medical evidence indicated that death was from an active cranial hemorrhage—that is, from a recent injury. On these proven circumstances, the court concluded [l.c. 310]: "a jury could quite readily have found beyond a reasonable doubt

that the fatal injury was not self-inflicted, nor due to natural causes or accident."

The evidence against the defendant May, on the other hand, lacked any such cogent circumstances. There was no evidence that May abused the child at any time [albeit the faded bruises may bespeak human cruelty]; there was no evidence of a weapon; there was no evidence that the injury was inflicted by a person; there was no evidence that the injury was recent; and, above all, there was no evidence as to the cause of death and that the defendant was the criminal agent of that fatality. What is left is merely opportunity, and that single circumstance does not suffice to sustain a criminal conviction. To describe that opportunity, as does the prosecution, in terms of "sole control" of the infant, forces the sense of language. The mother was present throughout the episode. The transport of the child up and down the stairs on each occasion was momentary: "long enough to lay her down and come back down." These movements by the defendant with the child were uneventful. The mother observed the infant after each displacement—except for the last time the defendant returned the child to the upstairs bed and then when he went to fetch the fan. The child was then either asleep or at play in the pen on the floor of the living room. Thus, the critical intervals of "sole control" were the moments when the defendant returned the child to the bed for the last time and the moments of his return to the upper floor for the fan. It was the testimony of the mother, however, that the defendant on each occasion was gone long enough only to either place the child on the bed or to gather her for return to the playpen. There is no evidence of anything untoward—an outcry, a noise, or other disruption. What was proven was only the circumstance of opportunity to commit the crime, and even that, only a momentary opportunity.

The prosecution invites our especial attention to *State v. Sneed*, 676 S.W.2d 301 (Mo.App.1984). In that case, the circumstantial evidence that the defendant live-in companion babysat with the child the entire day while the mother was at work. The defendant did not contest that the child was beaten during that day, but that he left the child for an interval with another person, an admitted drunk, and it was in his absence that the child was injured. The drunk disputed that he had ever assumed the duty to sit with the child, then or ever. There was medical evidence that the cause of death was from multiple fractures—arm and skull—and brain damage. The pathologist discounted that the head injury could have resulted from a fall, but gave opinion that they were possibly caused "by striking or flinging her against a wall." This evidence of the uninterrupted custody of the child throughout the day *and that the fatal injury was inflicted by human agency* [a proof which altogether lacks against defendant May] sufficed as circumstantial proof that the defendant was the criminal agent.

Yet another case cited in the prosecution brief bears on aspects of the proof essential to circumstantial guilt in an infanticide. *State v. Applegate*, 668 S.W.2d 624 (Mo. App.1984) affirmed the conviction of the sodomy and homicide of a child by the step-father who attended the child while the mother was at work. On the morning of the crime, the mother noticed bruises on the face and stomach of the child, but the infant acted normally, so she left for her employment. In the early afternoon, an ambulance was dispatched to the residence and the child was on the floor without pulse or breath. The child died within the hour. It was the contention of the defendant that the child was injured by a fall down a flight of stairs. Examination by physicians at the hospital disclosed the child had been dead for some time. Most of the bruises were fresh. There were injuries to the head and severe injuries to the pancreas, intestine, liver and other internal areas. *There was medical opinion that these could not have been caused* by self-infliction, or *by accident*—that is, a fall down the stairs. *There was medical opinion*, rather, *that the injury to the brain was inflicted by a human hand or*

*fist and that the internal injuries were probably caused by a blow against the abdomen from an adult fist or foot.* The mother gave evidence also that on an earlier occasion she saw the defendant kick the child, and that on another occasion she returned to find the child bruised, and when she asked for an explanation, the defendant responded with a threat to strike her. The court determined that the medical evidence proved the corpus delicti—that death was not from accident by human agency—and that the extended period of control over the child, the prior episodes of abuse and injury to the child, and the medical opinion that the injuries were inflictions but by the agency of another, proved that the defendant was the criminal agent. In the course of opinion [l.c. 631] the court rejected, once again, "the notion that proof that a child was fatally injured while in the custody of an adult is sufficient to create an inference that the adult inflicted those injuries."

The distinctions between the circumstantial proofs which sufficed in law to convict in *Applegate* and the evidence before the jury in the case on review are evident and decisive. There, the medical opinion was that the injury to the infant was not by accident, but by human hands. Here, that proof lacks, and the source of the injury remains a speculation. There, there were episodes of prolonged exclusive control by the adult over the child. Here, the episodes were momentary, and not exclusive. There, the adult kicked and abused the child on other occasions. Here, the mother never saw the defendant [or anyone else] strike or hurt the child. In sum: there, the circumstances proved a nexus between the defendant and the death of the child—evidence indispensible to conviction. Here, the nexus remains a speculation, and guilt remains unproven.

We share the alarm expressed in *State v. Morris*, supra, at the pervasiveness of child abuse and the recurrence of that species of human cruelty. We share also the caution of *State v. Morris*, supra, that "a proper disposition of [such an] ap-

peal requires consideration of the basic elements of any homicide case." The evidence does not prove beyond a reasonable doubt that the death of the child was caused other than by accident—that is, by the criminal agency of another—and that the defendant was that other.

The judgment is reversed and the defendant is discharged.

BERREY, J., concurs.

PRITCHARD, P.J., dissents in separate dissenting opinion filed.

PRITCHARD, Presiding Judge.

The majority opinion reverses the judgment of the trial court and discharges appellant wherein it says that there is a dearth of circumstantial evidence for the jury to have found, as it did, appellant guilty of manslaughter of the eleven month old victim, Toshua Lynn Meeker. In this I believe the majority errs in that it too narrowly circumscribes the rules governing circumstantial evidence, which a jury is entitled to consider.

There was evidence from the mother of the child that prior to July 24, 1981, when the child was found unconscious lying on her back in an upstairs room, that the general condition of her health was good, she having had normal childhood diseases such as chicken pox. On July 24th, the child was fussy because she was cutting teeth. On the day before, July 23, 1981, to be sure, the child had fallen face forward from an ordinary kitchen chair where she was sitting, striking her head upon a linoleum floor. The mother testified that the child's reaction to the fall was that "she just kind of cried for a little bit, and I picked her up and was playing with her, trying, you know, to get her to stop crying —." The mother thought it scared her more than it hurt her. Coupled with the mother's testimony that she thought the child was not hurt is that of Dr. Bonita Peterson, who performed an autopsy on the child after she died on July 30, 1981. Dr. Peterson first found a fluctuant or spongy area on the right side of the child's

head. On reflection of the scalp after incision, she saw a hemorrhage on the under surface of the scalp on the right side of the head, and also a fracture measuring 4½ inches in length, extending from the front part of the head towards the back, going slightly downward, at a slight angle. Upon removing the top of the skull, Dr. Peterson observed a layer of hemorrhage (blood) over the right side of the brain, the source of which, in her opinion, was broken blood vessels over the top of the head connecting the brain with the skull, related to trauma. Dr. Peterson also found the abnormality of the entire brain area as being very swollen, probably a reaction to trauma, and secondly, as a result of the child being on a ventilator. As to the severity of the injury, Dr. Peterson testified: "Q. You're talking about the skull fracture, and the damage, the edema, to the brain, based on your autopsy, and your experience, are you able to place this in a range of mild, moderate, severe, trauma? A. Well, I think I placed it in the category of severe in my final comments. Q. Is that still your opinion? A. Yes. Q. And what do you base that on? A. The extent of the skull fracture. It is not easy, because of an infant's skull, to fracture it, so there would have to be considerable force." Although Dr. Peterson could not, *on the basis of her autopsy,* tell whether it was a fall or a blow which caused the injury, she testified that the cause of death was a severe head injury, with skull fracture, and hemorrhaging, intra-cranial hemorrhage.

Dr. Peterson was asked to assume that Toshua Lynn Meeker was eleven months of age, that she took very few steps, basically crawling, that the day before she was taken to the hospital in respiratory distress, she had fallen from a kitchen chair, face forward, and assuming that following that, the child with the exception of some sleepiness, otherwise was her normal self. She was asked if she had an opinion that the type of head injury which she saw on July 30, 1981, could have been caused by such a fall. "A. Well, I would ask for a little bit more information. What was the floor? Q. Linoleum floor. A. And this was the

average kitchen chair? Q. Average kitchen chair. A. And your question was? Q. The type of skull fracture that you saw, and its location, could it have been obtained from that type of fall? A. No. Q. Is there any possibility? A. The child on its own? Q. Yes. A. No. Q. Is there a point in time where your opinion would change, depending on the height of the chair? A. Well, it seems very unlikely that the chair could be high enough to cause that type of injury from a fall, unless there was some force behind it. In other words, the child just from a chair, no. Now, if it was from a second floor window, or something like that, yes."

The events during the day of July 24, 1981, are important. The child's mother testified that she, the child and appellant had been living at 1307 Gilmore in Trenton, Missouri, for about a month. She was with the child all day on July 24, 1981, and appellant was in and out, and was not with the child all day long. The three of them, Toshua, appellant and Toshua's mother, went to the home of appellant's parents, Leon and Daisy May, about noon, and went back there about 4:30 p.m., and stayed outside at a picnic table until about 5:30 p.m., visiting and talking. During this time, Toshua was sitting on Daisy May's lap when she was not crawling around on the ground. At the time Toshua was learning to walk, taking a few steps with assistance. Leon May took the three of them home about 5:30, and about 6:30, the three walked five or six blocks uptown, where they met appellant's sister who took them in her vehicle to a liquor store and then drove them home. The three were with the sister for about thirty minutes, driving around for about ten minutes during which time Toshua and the sister's daughter were playing. Appellant, Toshua and her mother arrived at 1307 Gilmore around 8:00 that evening. Toshua was in the playpen in the living room, appellant was painting the kitchen door, and the mother started washing her hair in the kitchen. The mother heard Toshua in the playpen "just jabbering".

About 10 or 15 minutes after they arrived home, and while the mother was still washing her hair, she heard appellant go upstairs with the child, which apparently had gone to sleep. Appellant was upstairs just long enough to lay the child down, then come back down, and started painting on the kitchen door. In about 15 minutes, when the mother was in the living room, appellant went back upstairs and brought the child, who was then awake, back down and laid her in the playpen where she went right back to sleep. The mother was then combing her hair, and appellant was then sitting in a chair smoking a cigarette, which he had lit up right after he brought the child downstairs. Appellant eventually took the child, still asleep, back upstairs, being gone long enough to lay her down, and come back down. The mother and appellant then sat in the living room listening to the radio or watching T.V. According to the mother, the next thing that occurred was: "A. It was hot, and Steve said he was going upstairs to check on her, and get a fan, and he went upstairs to check, and he said something—he come back downstairs, and said 'something' was 'wrong with Toshua', so I run upstairs, and she was unconscious, so we both ran to the neighbor's house, but she wasn't at home, so Steve told me—Huh? Q. There was no one else in the house, at that time? A. But just her. Q. So, you ran next door to the neighbor's, and no one was home? A. Uh huh, and he told me to go back upstairs, and stand by her, and he'd go get his mom." Appellant was gone about 5 minutes to get his parents, during which time Toshua's mother stayed with her. Toshua was unconscious, white, lying on her back, looking forward with her eyes open, but was not responsive.

Appellant's mother, Daisy May, had been around Toshua for seven to nine months prior to July 24, 1981, during which time she described her health as "fine". The child had chicken pox, and a cold a time or two, nothing serious in that time. Daisy saw the child around 3:30 or a quarter to 4 in the afternoon at Daisy's home, for about one or one and a half hours, along with the child's mother and appellant, who ate some food and fed Toshua some green beans. Daisy was asked, "Q. Did you notice anything unusual about her on July 24th? A. Yes, I did. Q. What? A. She was sleeping acting, and she just didn't do that, and I made the remark immediately, I said 'What's the matter with Toshua?', and Norma said 'She does this a lot of times, sleeps a lot.' Q. You were not acquainted with that though? A. No, I wasn't."

The jury could have found these facts which are supportive of its verdict of guilt: The child had been in previous fine health excepting non-serious childhood diseases. During the day of July 24, the child was in good condition, crawling on the ground, eating and sitting on Mrs. May's lap, and at about 8:00 that evening, she was sitting in her playpen "just jabbering". She was just learning to take a few steps at her tender age of eleven months. During all of the time when appellant was carrying the child up and down the stairs he had the *exclusive control or custody* of her—the mother, the only other person present, was washing and combing her hair and watching T.V. or listening to the radio. Although the mother did not ever see appellant or anyone ever strike the child, the jury could find that the fracture to the right side of the head was inflicted during the time that appellant had charge of her, between 8:00 p.m. and 9:00 p.m., on July 24, 1981, the latter time being about when she was found unconscious, lying on her back, in the upstairs bedroom.

Although the majority opinion makes much of the fact that the doctors who attended the child after medical attention was sought could not attribute a cause of the injury to a fall or a blow [i.e., Dr. Ryan could give no opinion as to the cause of mushiness on the back of the skull; Dr. Elrod, diagnosing a possible skull fracture (later confirmed), testified it was "unexplained trauma, or even unexplained ongoing trauma"; Dr. Fall could not say whether the trauma was a fall or a blow; and Dr. Peterson saying that there was no clue as to whether it was a fall or a blow]. Dr.

Peterson testified further that it was not unusual not to have such a clue. She testified further that the *cause of death* was a severe head injury (trauma), with skull fracture and hemorrhaging, intra-cranial hemorrhage. She placed the trauma as severe based upon the extent of the skull fracture, which in an infant is not easy, but it would have to be with *considerable force.* Dr. Peterson (and the testimony of the mother) ruled out, for the jury's consideration, that the severe head injury could have been caused by the fall (accident) from an ordinary kitchen chair the day before the child was found unconscious. Certainly, the jury could have found and believed that this severe and massive head injury could not have been self-inflicted by this toddler. What is important here, also for the jury's consideration is the fact that the severe head injury would have required considerable force on this infant, and the jury could have reasonably found that during the minutes that appellant had exclusive custody of the child, coupled with the other circumstance that the child was in prior good condition, a blow of "considerable force" was somehow administered to it by a human agency so as to cause its subsequent death. The state was not required to allege and prove the precise manner in which the child was killed, *State v. Clark,* 546 S.W.2d 455, 463[10] (Mo.App. 1976), or to prove the nature of the weapon, or indeed, that any weapon was used, *State v. Morris,* 564 S.W.2d 303, 311 (Mo. App.1978). Nor was the jury required to have before it medical evidence as to the cause of the infliction of the head injury. The evidence, considering all of the circumstances, and the rule that on review it must be regarded, with all legitimate inferences, in the light most favorable to the verdict, points immutably to appellant's guilt.

At page 308, footnote 5, of *State v. Morris,* supra, certain cases from other jurisdictions are cited which the court declined to follow. In *State v. Applegate,* 668 S.W.2d 624, 631 (Mo.App.1984), the matter is clarified: "The infant victim was in the defendant's custody when he was fatally injured. In *Morris,* 564 S.W.2d at 308, n. 5,

this court rejected the notion that proof that a child was fatally injured while in the custody of an adult is sufficient to create an inference that the adult inflicted those injuries, and we again reject that notion. The fact that the victim was in the defendant's custody *is only one circumstance* to be considered." [Italics here added.] Of course, in the *Morris* and *Applegate* cases, the matter of custody by defendants was not a single circumstance, but others in the cases pointed to defendants' guilt, but if the *Morris* and *Applegate* cases stand for the proposition that where the child is in previous good condition; the evidence rules out a fall (as from an ordinary kitchen chair) as being the cause of the injury; that there is no evidence of accident or self-infliction of the injury as by playing; that the jury may not infer that a defendant inflicted the massive injury during the minutes that he had the sole and exclusive custody, then this writer would disagree with the statements. The probative effect of that circumstantial evidence should be reviewed by the Supreme Court. Although involving the "battered child syndrome" (an increasingly judicially recognized concept), meaning repeated serious injuries by nonaccidental means, these cases stand for the conclusion, based upon logic and reason, that the injuries were occasioned by someone ostensibly caring for the child: *People v. Jackson,* 18 Cal.App.3d 504, 95 Cal.Rptr. 919 (1971); *State v. Loss,* 295 Minn. 271, 204 N.W.2d 404, 409 (1973); *Rinehart v. State,* 641 P.2d 192, 194 (Wyo. 1982) [death of an 11 month old child, in appellant's custody, caused by shaking her]; *Grabill v. State,* 621 P.2d 802, 806 (Wyo.1980) [infant's head injury occurred while appellant had sole and exclusive custody]; *Jones v. State,* 580 P.2d 1150, 1152 (Wyo.1978) [head injuries not present prior to the time the 19 month old child came under appellant's exclusive control, and the hemorrhage could not have been caused by a fall from a high chair or other accident in the attending doctor's opinion]; *Goldade v. State,* 674 P.2d 721, 727 (Wyo.1983) ["In a series of cases this court has recognized

that opportunity, together with injuries consistent with child abuse, is sufficient evidence to support a conviction for homicide."].

Appellant's further points that the trial court erred in failing to exclude the testimony of Dr. Ryan, and in failing to require the state to file an adequate bill of particulars (of information it did not have) have been considered and are found to be without merit.

For the foregoing reasons, I dissent from the majority opinion. The judgment should be affirmed.