**STATE of Missouri, Plaintiff-Respondent,**

v.

**Lex Ray APPLEGATE, Defendant-Appellant.**

**No. 12590.**

Missouri Court of Appeals, Southern District, Division Two.

March 28, 1984.

George M. Johnson, Springfield, for defendant-appellant.

John Ashcroft, Atty. Gen., Jay A. Daugherty, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

HOGAN, Judge.

By two-count information, defendant Lex Ray Applegate was charged with second-degree murder, as defined and denounced by § 565.004, RSMo 1978,[1] and with sodomy, as defined and denounced by § 566.-060. The victim was one Donald Eugene Medley, a male child about 2½ years of age. At the defendant's request and with the trial court's consent, trial was had to the court without the aid of a jury. The court found the defendant guilty of second-degree murder as charged in Count I of the information and assessed his punishment at imprisonment for a term of 99 years; the court further found defendant guilty of sodomy as charged in Count II of the information and assessed his punishment for the commission of that crime at imprisonment for 10 years. It was ordered that the sentences run consecutively. The defendant has appealed.

Three assignments of error have been briefed and submitted in this court. Two of these arguments have to do with the admission of evidence; the third and most important has to do with the sufficiency of the evidence to support the judgments of conviction.

■ As the defendant reminds us, the State's case upon each count is wholly and entirely circumstantial. Nevertheless, all evidence upon the whole record tending to support the guilty verdicts must be taken as true, contrary evidence must be disregarded and every reasonable inference tending to support the verdicts must be indulged. *State v. Lee,* 556 S.W.2d 25, 32[13] (Mo.banc 1977); *State v. Cobb,* 444 S.W.2d 408, 412[3] (Mo.banc 1969); *State v. Morris,* 564 S.W.2d 303, 304[1] (Mo.App. 1978).

On February 13, 1981, the defendant and his wife, Debra Sue, lived in an apartment on the near west side of Springfield. Before Debra Sue married the defendant, she had become the mother of three illegitimate sons, Randy, Donald and Shawn. The two younger sons, Donald and Shawn, lived with the defendant and his wife. Donald, the victim of the crimes charged, was born June 27, 1978; he was therefore not quite 3 years old when he died. Shawn, the victim's younger brother, was not quite two years of age. At the time in question, Debra Sue was employed; the defendant was not. The defendant therefore stayed at home and looked after the children while Debra Sue worked.

On February 13, Debra awoke about 6 a.m. She dressed and made a pot of coffee. While Debra was in the kitchen, Donald woke up and came in the kitchen. He was fully clothed, having slept in his clothing. Debra held the child for some time; she noticed a bruise on the right side of Donald's face and another on "his stomach," but it is inferable from Debra's testimony that Donald was sleepy but normal when she left for work at 7:15 a.m. The defendant and the younger child were still asleep; Donald was left on a couch.

About 1:45 p.m. an ambulance was dispatched to the defendant's apartment. Ambulance attendants found Donald lying on the floor in a "living room-family room." The child was fully dressed; the attendants found no pulse and the child was not breathing. The attendants nevertheless attempted cardiopulmonary resuscitation and transported the victim to the emergency room of a large general hospital in north Springfield.

At the hospital, heroic efforts were made to revive the child, but it soon became obvious that these efforts were nonproductive, and the child was pronounced dead at 2:33 p.m.

I

(Sufficiency of proof of homicide)

(a)

■ The sufficiency of the evidence to support the conviction of second-degree

1. Citations to statutes and rules are to RSMo 1978 and to Missouri Rules of Court (12th ed. 1981), except where otherwise specifically noted.

murder in this case is best analyzed by resort to the corpus delicti of the crime. This is true because, as was the case in *State v. Morris*, 564 S.W.2d 303, the defendant's sufficiency point is not specifically directed to a failure of proof of one or more of the basic elements of second-degree murder.[2] Rather, as drawn, the defendant's contention is that the evidence "... did not meet the standard of being inconsistent with defendant's innocence to the exclusion of every reasonable hypothesis of his innocence because while the State's evidence ... did show that [the] victim died from blows to the abdomen consistent with being struck by a fist or foot, the evidence ... did not show that the death was inconsistent with a fall down a flight of stairs combined with landing on or striking a concrete block as testified to by [the] defendant."

■■■ Though it has been variantly stated, the corpus delicti in a homicide case consists of two elements: (1) the death of a human being, and (2) the criminal agency of another. The elements of the corpus delicti cannot be said to be established until it has been proved that the death was not self-inflicted, nor due to natural causes or accident. The State must further prove, as an additional element, a criminal act of the defendant (his agency) as a cause of the victim's death. *State v. Meidle*, 202 S.W.2d 79, 81 (Mo.1947); *State v. Joy*, 315 Mo. 7, 19–22, 285 S.W. 489, 494–496[8] (concurring opinion) (1926); *State v. Crabtree*, 170 Mo. 642, 650, 71 S.W. 127, 129 (1902). Nevertheless, all the elements of a homicide case may be proved circumstantially. *State v. Ross*, 371 S.W.2d 224, 225[1] (Mo. 1963); *State v. Morris*, 564 S.W.2d at 309. Further, the evidence which tends to prove the second element of the corpus delicti may also be relevant upon and tend to prove the defendant's criminal agency. *Meidle*, 202 S.W.2d at 81; *Joy*, 315 Mo. at 21, 285 S.W. at 489. We would not be misunderstood; defendant's argument is presented in terms of "causation," but as noted in *Morris*, 564 S.W.2d at 309, n. 6, the determination of "agency" involves much the same inquiry as the determination of "causation." As we shall see, the necessary element is often called "cause and effect" in child-abuse murders.

(b)

Upon trial and in this court, the defendant maintained that the victim died as a result of a fall down a flight of stairs. The defendant and his wife lived in a walk-up flat; we do not know precisely whether the building was a two, three or four-story building, but State's exhibits 3, 4, 5 and 6 show that as one leaves the apartment, he must turn left and descend a flight of stairs to leave the building. Exhibit 5 shows a concrete block at the foot of the stairs. At the foot of the stairs on a landing, there is an 8-inch concrete block. The block was used as a doorstop.

Officer Dennis, a witness for the State, testified that the photographs of the stairway were taken February 13, 1981. At that time he observed that the stairs were wooden stairs; the stairway was composed of 18 risers and 17 treads; the entire stairway was carpeted; there were walls on both sides of the stairway, and on the west (right side as one descends) there was a handrail about 30 inches high. Later, this officer verified his measurements and took others. The stairway, from top to bottom, measured 16 feet 2 inches; the width of the landing from the bottom of the stairs to the wall opposite, was 5 feet.

In State's exhibit 5, the concrete block is shown as being positioned very near the wall opposite the bottom of the stairs. Debra Sue testified the block was in the position shown on Exhibit 5 when she left for

---

**2.** The elements of second-degree murder, as defined and denounced by § 565.004 are the (1) willful, (2) premeditated, (3) killing (4) of a human being (5) with malice aforethought. *State v. Mannon*, 637 S.W.2d 674, 678 (Mo.banc 1982); *State v. Franco*, 544 S.W.2d 533, 535 (Mo.banc 1976), cert. denied, 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275 (1977). The specific intent required by § 565.004 is that the defendant specifically intend to kill or specifically intend to do great bodily harm. *Mannon*, 637 S.W.2d at 679[3].

work on Friday, February 13, 1981. She stated: "It [the concrete block] was just like this. I can remember." The witness elaborated; she had seen the block "laid down on its side before, but it was always in the same spot."

Contending that the victim's injuries and death were caused by a fall, the defendant maintained the block was not over and against the wall as shown by Exhibit 5 when the child fell, but instead "was settin' out from the wall a ways." Defendant maintained that after Debra Sue left for work, he started to take the victim and his younger brother outside. He was carrying the younger boy; the victim started down the stairs and fell. Because Exhibit 43 is not before us, we cannot accurately determine where the child started falling, but defendant testified he "seen him bounce once" and further testified the victim "fell over head first and went down like on his stomach." It is not clear from the defendant's testimony whether the child struck the concrete block as he was falling or whether the concrete block fell on the child, but in any event, the relevance of the testimony we have just recited in laborious detail becomes apparent: Whether or not the child tumbled part way down a flight of carpeted stairs, a rational trier of fact could have found, without the aid of expert testimony, that the child did not strike the concrete block.

Turning abruptly to the State's evidence, the victim was seen and clinically examined by two physicians, Dr. Bennoch and Dr. Ludwig. These physicians specialized in emergency medicine. Dr. Bennoch had an internship and a residency in pediatrics. It was obvious to him that the child had been dead for some time. Having determined that fact, Dr. Bennoch observed that the child had a very distended abdomen, so he and the other physician did a peritoneal tap, which involves inserting a large cathe-ter into the abdomen just below the umbilicus. When the catheter was inserted, a forceful spray of blood was ejected from the victim's abdomen. This indicated there had been severe damage to one of the organs in the abdomen.

This physician also found numerous bruises of varying duration over the body of the victim. Most of the bruises looked relatively fresh, but some were "at least a day or two older." Based on his observation, this witness determined that the injuries sustained by the victim were such as would have been produced by a blow from a fist or foot.[3] Dr. Bennoch was further of the opinion that a male child the victim's age could not have sustained such severe abdominal injuries by falling down a flight of stairs.[4]

Dr. Bennoch was also shown some autopsy photographs; these photographs, particularly State's exhibit 31, indicated the victim's pancreas had been transected, which in this case means mashed in two. The witness was of the opinion that such injuries would be fatal almost immediately.

Dr. Ludwig, a specialist in emergency medicine, had not personally observed the victim's intra-abdominal injuries, but he was shown the autopsy photographs. Based on this observation, this physician concluded the injuries were inconsistent with a fall down a flight of stairs because of the severity and extensiveness of the injuries. The order of force required to cause such injuries, in Dr. Ludwig's opinion, would be that order of force generated when an occupant of an automobile is impaled upon the dashboard or steering wheel. Dr. Ludwig would expect the victim of such injuries to expire in less than an hour.

Dr. Paul S. Quinn, chief of pathology at the hospital to which the victim was taken, performed the forensic autopsy. Dr. Quinn

---

**3.** The phrase used in the questions to the witness was "consistent with," presumably to avoid invasion of the province of the trier of fact.

**4.** "... [I]n the abdomen of a small child that is distended and bleeding, there's almost nothing you can think of other than falls upon sharp objects or the car accidents or force from a blow that's relatively concentrated that would give you specific damage to specific areas in the abdomen...."

had performed about 1,000 autopsies in the course of his career as a pathologist. This physician's autopsy procedure was to make a meticulous examination of the external surfaces of the body and then proceed with the internal examination.

Externally, Dr. Quinn found several bruises and abrasions over the head and the chin of the victim, including some on the left posterior part of the head. The victim showed abrasions around the mouth, severe enough that the lips were almost cut. There were four bruises along the left side of the victim's face and neck, as demonstrated by State's exhibit 19, which are aligned in the same pattern as the fingers of a human hand; Dr. Quinn was of the opinion, based on reasonable medical certainty, that these bruises were inflicted by the fingers of a hand, either from a fist or a slap. This physician had also observed some bruising of the victim's brain and some brain hemorrhage upon removal of the skull cap, but the head injuries were not serious enough to have caused the child's death.

A reading of the extensive medical testimony causes one's attention to focus upon the exterior bruising of the child's chest and abdomen and posteriorly over the back surfaces of the body. There were approximately 20 such bruises, varying in size, some almost an inch in diameter, many of them circular. Dr. Quinn examined these bruises microscopically, and based on this microscopic examination, concluded the bruises were of recent origin. By "recent origin" the doctor meant the bruises had been inflicted 6 to 8 hours before the autopsy.

Thereafter, Dr. Quinn opened the victim's abdomen. He found severe hemorrhage within the abdomen and in the mesenteric tissues that support the bowel, and tears and lacerations of the mesentery at two separate sites. The mesentery is that tissue which encases the bowel. The mesentery, at the point here involved, retains the large intestine in contact with the back or posterior wall of the abdomen. Normally, the right or ascending colon is "tucked down in against the loin area in the right lower abdomen against the back"—in short, it is attached to the back.

This part of the large intestine had been torn free from the back so it could be lifted free from the abdomen. The tear in the tissue holding the right colon to the back was about 4½ inches long. The autopsy surgeon was of the opinion that this section of the colon had been torn loose from the victim's back by the application of extremely violent force. His opinion, based on reasonable medical certainty, was that the mesenteric tear was caused by the application of force by a fist, a foot, or some object the size of the toe of a shoe or boot. This because the force required would have to have been concentrated in the area between the rib cage and the anterior wing of the pelvic bone. The doctor also had the opinion that the force was applied from the right back area, or possibly from the left front at an angle. The angle and focus of the force was demonstrated to the trial court. One blow would have been sufficient. The doctor also expressed the opinion, again based on reasonable medical certainty, that this particular injury could not have been caused by falling down stairs, nor could it have been self-inflicted.

To avoid prolonging this recitation of facts interminably, we will say the autopsy disclosed two other gross, severe injuries to the organs which lie in the abdominal cavity. The pancreas is a soft, pulpy organ which lies in the left, upper abdominal cavity. An additional blow of extreme force had transected the pancreas over the spine; this meant it had been "squeezed in two over the spine." This injury had been produced, according to the autopsy surgeon, by the use of some object capable of concentrating a violent force into a rather small area, "a toe, a boot, tip of a boot, a fist or a two-by-four driven into the belly [of the victim]." Dr. Quinn was of the opinion, based on reasonable medical certainty, that the child could not have sustained a transected pancreas by falling down a flight of stairs. A further gross internal injury is demonstrated in State's

exhibit 29, a photograph which shows part of the viscera after removal from the abdomen. The victim's liver has been rotated so as to show its inferior aspect. The inferior aspect (underside) shows a long traumatic tear near the lower edge of the organ. This injury, one of the three gross internal injuries disclosed by the autopsy, could have been produced by a fall down a flight of stairs, but Dr. Quinn considered such cause a remote possibility. Rather, the injury was probably caused by a blow's being struck against the abdomen by an adult human's fist or foot.

The mesenteric tear and the transected pancreas and tear in the victim's liver were produced, in Dr. Quinn's opinion, by at least two separate blows, although the damage to the liver and pancreas could have been the result of a single blow. The doctor found no external abdominal bruises which would correspond with the internal injuries, but this lack of correspondence was explained by the fact that even though there was internal damage, a corresponding surface bruise would not appear for some time. It will be recalled that microscopic examination of the bruises on the victim's trunk and body had shown the contusions were very recent.

The court also received, over defendant's objection, testimony of the defendant's former wife that in October and November 1980, she was employed and defendant "stayed with" her children, the victim and his younger brother. When Debra Sue, the former wife, found that the children had been bruised in her absence, she asked the defendant "how [the bruises] got there"; defendant responded by threatening to strike her. On one occasion, Debra Sue saw the defendant kick the victim.

### (c)

▆▆▆ The sufficiency issue could be divided and subdivided and approached from several different angles. However, the first essential question is whether the evidence was sufficient to establish the defendant's agency—his act—as the cause of the victim's death, as opposed to accident. We consider it sufficient. Defendant in his brief urges that the circumstances shown by the State are not inconsistent with his innocence and do not exclude every reasonable hypothesis of his innocence. The rule of law to which counsel refers is and must be realistically tempered in its application because even in a homicide case, the circumstances need not be absolutely conclusive of guilt and they need not demonstrate the impossibility of his innocence; the mere existence of other hypotheses is not enough to remove the case from the jury or other trier of fact. *State v. Franco*, 544 S.W.2d at 534–35, cert. denied 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275; *State v. Thomas*, 452 S.W.2d 160, 162 (Mo.1970). Such conclusional language does not, of course, point to the particular circumstances which establish the defendant's agency. These circumstances are:

1. The infant victim was in the defendant's custody when he was fatally injured. In *Morris*, 564 S.W.2d at 308, n. 5, this court rejected the notion that proof that a child was fatally injured while in the custody of an adult is sufficient to create an inference that the adult inflicted those injuries, and we again reject that notion. The fact that the victim was in the defendant's custody is only one circumstance to be considered.[5]

2. There was evidence that the defendant had struck or kicked the infant on other occasions. Proof of other, distinct offenses is not admissible in criminal cases unless such proof has some legitimate tendency to establish the very crime with which the defendant is charged, but there are exceptions to this rule and the exceptions are as well established as the rule. *State v. Reese*, 364 Mo. 1221, 1226, 274 S.W.2d 304, 307 (banc 1954); *People v. Molineux*, 168 N.Y. 264, 61 N.E. 286, 294, 62 L.R.A. 193, 237–40 (1901). When the proof of other offenses may tend to establish mo-

---

**5.** See Comment, Evidentiary Problems in Criminal Child Abuse Prosecutions, 63 Geo.L.J. 257, 262–63 and nn. 33, 34 (1974).

tive, or intent, or absence of accident or mistake, or identity of the defendant, or a common scheme or plan embracing the commission of separate similar offenses so interrelated to each other that proof of one tends to establish the other, such offenses are widely held to be admissible in proof. *State v. Lunsford*, 338 S.W.2d 868, 872 (Mo.1960); *State v. Letterman*, 603 S.W.2d 951, 956 (Mo.App.1980); 2 Wigmore, Evidence § 304, p. 249 (Chadbourn rev. 1979). In this case, the head injury, the external bruises and finally the vicious assault which resulted in the victim's death are unequivocally part of a pattern, and evidence of other assaults upon the infant's person was relevant, admissible, and had a logical tendency to prove the defendant's guilt. *Letterman*, 603 S.W.2d at 956.

3. The expert testimony received from the physicians was, taken with the other proof received, evidence of the defendant's agency. It has been recognized that expert testimony bearing upon the cause and effect of the victim's injuries in child-abuse homicides is admissible and of probative value even though the expert opinion is expressed only in terms of possibility or probability, if that evidence is corroborated by other evidence tending to show causation. *State v. Banister*, 512 S.W.2d 843, 848[4, 5] (Mo.App.1974). There was corroborating circumstantial evidence of the defendant's agency, but the prosecuting attorneys in this case had taken the teaching of *Kimmie v. Terminal R.R. Ass'n of St. Louis*, 334 Mo. 596, 604, 66 S.W.2d 561, 564 (1933), to heart, and their inquiries touching the cause of the victim's injuries were phrased in terms of "reasonable medical certainty."

The collations of authority indicate general acceptance of the view that a properly qualified physician may give opinion testimony derived either from his personal observation or based on hypothetical questions, as to the probable cause of death in homicide cases. Annot., 65 A.L.R.3d 283, § 2[a], pp. 287–92 (1975). Such evidence is not conclusive upon the jury, but in many cases it has been held that the unequivocal testimony of a single expert witness is

sufficient to establish the corpus delicti. Annot., supra, 65 A.L.R.3d 283, § 11, pp. 313–19.

▬▬ Here, the evidence given by the autopsy surgeon was undoubtedly sufficient to show the defendant's agency. It was not necessary for the physicians to express the amount of force necessary to have produced the infant victim's fatal injuries in foot-pounds of force. Dr. Ludwig's testimony was that such injuries are commonly sustained by the victims of automobile accidents who have been impaled on the dashboard or steering wheel; Dr. Quinn, the autopsy surgeon, explained the medical inferences arising from the location, severity and extent of the infant victim's injuries, including the probable magnitude and direction of the force required to produce those injuries. We are in no doubt whatever that the expert testimony, taken with the other circumstances in evidence, was sufficient to establish the defendant's agency.

If one subscribes, as most of us do, to the "yellow corn case" theory of persuasiveness, *State v. Brown*, 300 N.C. 731, 268 S.E.2d 201 (1980), is convincing. There the defendant was charged with the murder of his 18-month-old stepdaughter. The victim had been taken to the emergency room on a Sunday afternoon, in critical condition from a head injury. The child died 6 days later. Defendant maintained the child had been injured by a fall down a flight of wooden stairs. At trial, three doctors, accepted by the court as expert witnesses, testified for the State that in their opinion the extent, severity and location of the child's injuries were inconsistent with a fall down a flight of wooden stairs. On appeal, the court held such evidence was admissible and inferentially, that it was sufficient to sustain a conviction of second-degree murder. See also *People v. Kinzell*, 106 Ill.App.2d 349, 245 N.E.2d 319, 322–23[2–4] (1969); *Commonwealth v. Boudreau*, 362 Mass. 378, 285 N.E.2d 915, 918[5, 6] (1972) (pathologist competent to testify whether mesenteric hemorrhage

was caused by a kick or sharp blow to the abdomen); *People v. McFee,* 35 Mich.App. 227, 192 N.W.2d 355 (1971) (Physician allowed to testify a severe beating of foster child caused regurgitation of food, triggering reflex action which caused cardiac arrest; conviction of second-degree murder affirmed).

▆▆▆▆ Demonstrating that the evidence was sufficient to permit any rational trier of fact to find every element of the crime charged is less important here, where the cause was tried to the court, than in cases tried to a jury. The trial judge who heard this case had had considerable experience as a prosecutor and as a criminal defense attorney before he became a member of the bench, and thereafter had tried many criminal cases. We are entitled to assume the court knew the elements of second-degree murder, as set out marginally above. There are a good many sound precedents which hold that when an assailant beats or kicks a helpless victim to death, the elements of second-degree murder may be inferred from the circumstances. See, e.g., *State v. Tettamble,* 431 S.W.2d 441, 442–43 (Mo.1968); *State v. Morris,* 564 S.W.2d 303. An element-by-element discussion is unnecessary. The evidence was sufficient to support the conviction of second-degree murder.

## II

(Sufficiency of the evidence to support the conviction of sodomy)

### (a)

The defendant was further charged with and found guilty of sodomy upon the person of the infant victim. The State's theory was that the defendant had sexually abused the victim over a considerable period of time by repeatedly performing acts of sodomy per anus upon the child. The State had evidence that the child was fully clothed from the time his mother left him up to the time he reached the emergency room. There the victim was examined, and two unusual circumstances were noted: The victim had some swelling and contusion of the scrotum on the right side, and the anus showed multiple scarring and was very lax.

Dr. Bennoch had, on at least 30 occasions, seen individual cases of child sexual abuse by anal penetration. There were, generally, two types of such abuse clinically presented: First, a very recent abuse, perhaps a single episode. The muscle of the sphincter is still intact, but there are usually some tears down toward the muscle. In chronic cases, multiple scarring around the circumference of the anus and usually destruction or, at least dilatation of the muscle is presented. The chronically abused anus of a child presents much the same appearance and condition as that of a practicing homosexual. Initially, the finding is very similar. Dr. Bennoch's examination revealed scarring around the anus of the dead child and lax musculature which convinced him that the victim had been repeatedly violated, probably by an erect penis.

Dr. Ludwig elaborated upon the pattern of anal scarring. He observed that the anal opening appeared dilated, more so than normal even in death. There was a pattern of scarring radially around the anus, and some bruising very close to the anal opening. The bruising was found in the movial fold, which is that tissue lying between the buttocks. In Dr. Ludwig's opinion, the anal scarring was not caused by difficult defecation following constipation, although laceration can be caused by difficult bowel movements. Laceration caused by difficult bowel movement occurs in one place and recurs; the pattern of scarring is entirely different.

▆▆▆▆ Pubic hair was removed from the genital and scrotal area of the victim's body. This hair was compared with pubic hair taken from the defendant's body. Witness Geitzen, a criminal laboratory technician trained in hair and fiber identification, testified it was his opinion, based on reasonable scientific certainty, that the pubic hair taken from the victim's body and that taken from defendant's person had a common origin. Seminal stains were found

on the victim's trousers and on the defendant's shirt collar. There was evidence indicating the seminal fluid could have come from the defendant's body. The defendant had some evidence to the contrary, but here, as with the charge of murder, the State is entitled to the most favorable view of the evidence, and the benefit of all reasonable inferences to be drawn therefrom. *State v. Crosby*, 564 S.W.2d 357, 358 (Mo. App.1978).

### (b)

The offense of sodomy is defined and denounced by § 566.060, RSMo (Supp. 1983), effective when the victim died. Laws of Mo.1980, p. 497–98, effective August 13, 1980. Section 566.060.3, RSMo (Supp.1983), provides that a person commits the crime of sodomy if he has deviate sexual intercourse with another person to whom he is not married [and] who is less than 14 years old. Former § 566.060.1(2) defined and denounced sodomy in the same terms, omitting the words "to whom he is not married." For our purposes, the distinction is of no consequence. The defendant is a male 21 years of age; the victim was a male 2 ½ years old.

▮ The particular sodomitic act involved is mechanically so similar to rape that we consider the cases applicable to forcible rape applicable here. Very recently, in *State v. Taylor*, 663 S.W.2d 235, 239[6] (Mo.banc 1984), our Supreme Court stated "it is nearly bromidic that a physician may give his opinion that a rape victim's wounds were caused by forcible sexual intercourse." The court cited *State v. Berry*, 609 S.W.2d 948 (Mo.banc 1980), and other precedents. Here, the expert testimony was based on direct examination and experience; no one of the physicians testified in such manner as to indicate the defendant's guilt or innocence; defendant's agency could be inferred, however, from the presence of his pubic hair on the victim's underwear and the presence of seminal stains. There was expert testimony negating natural causes or self-infliction of the anal injuries. The evidence was suffi-

cient to support the judgment of conviction of sodomy.

### III

### (Error in admission of other crimes)

The defendant assigns error to the admission of evidence of other offenses in two respects: 1) he maintains that the trial court erroneously received evidence that the defendant assaulted the victim on several occasions prior to the final, fatal assault; 2) the trial court erroneously received evidence of sexual offenses committed against the person of the victim's younger brother Shawn. What we have said disposes of the first assignment of error.

The court did hear some evidence indicating that the younger child had been subjected to sodomitic sexual abuse. Counsel draws our attention to *State v. Atkinson*, 293 S.W.2d 941 (Mo.1956). In *Atkinson* the court, recognizing an exception to the general rule prohibiting proof of other, distinct crimes to show the commission of the offense charged, also recognized an exception to the rule in cases involving unnatural sex crimes but held that proof of other like sexual crimes with other persons do not come within the exception. *Atkinson*, 293 S.W.2d at 943–44. The court suggested, however, that evidence of other sexual offenses committed with or against other persons would be admissible if the State were obliged to rely on circumstantial evidence or if the defendant's identity were in issue. Id., 293 S.W.2d at 943.

▮ In this case, the State was obliged to rely on circumstantial evidence and the identity of the perpetrator was in issue as to the charge of sodomy, as well as to the charge of murder. Further, the regular pattern of abuse embraced the commission of separate similar offenses so interrelated that proof of one tended to establish commission of the other, although in our view proof of the commission of sodomy upon the person of the victim's younger brother was not necessary for that purpose in this case. Even if the evidence chal-

lenged was erroneously received, such error affords no basis for reversal in this court-tried case. There is nothing in the record to suggest that the trial court relied on the evidence of other sexual assaults committed upon the person of the victim's brother and the record aside from such evidence is sufficient to sustain the judgment of conviction. *State v. Deaver*, 662 S.W.2d 871, 872–73 (Mo.App.1983); *State v. Travis*, 625 S.W.2d 630, 631[2][3] (Mo.App. 1981); *State v. Leigh*, 580 S.W.2d 536, 545[13] (Mo.App.1979).

### IV

Defendant's final point is that Debra Sue Monohon, his former wife, was not competent to testify against him, and that her statement that he threatened her when she asked about the unexplained bruises was a confidential communication within the purview of § 546.260.

 It is true that at common law a husband or wife could not testify for or against the other in any legal proceeding to which the other spouse was a party except in the prosecution of one for criminal injury to the other, and § 546.260 does not completely remove all common law disability of a spouse to testify for or against the other. *State v. Shafer*, 609 S.W.2d 153, 155–56 (Mo.banc 1980). Nevertheless, divorce removes the disability retained in the first proviso of § 546.260, *State v. Euell*, 583 S.W.2d 173, 177 (Mo.banc 1979), and in any event Debra Sue could testify to the prior assaults on her children under the common-law exception developed in *State v. Kollenborn*, 304 S.W.2d 855, 863–64 (Mo.banc 1957). The defendant's threats to do violence to his former spouse were not confidential communications within the meaning of § 546.260. *State v. Johnson*, 586 S.W.2d 437, 441, n. 3 (Mo.App.1979). The final point is without merit.

We find no error in any respect briefed or suggested to the court; accordingly, the judgments of conviction are each and severally affirmed.

MAUS, P.J., and PREWITT, J., concur.