STATE of Missouri, Respondent,

v.

James H. WILLIAMS, Sr., Appellant.

James H. WILLIAMS, Sr., Movant,

v.

STATE of Missouri, Respondent.

Nos. 63314, 65682.

Missouri Court of Appeals,
Eastern District,
Division Two.

April 4, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 9, 1995.

Raymond L. Legg, Dist. Defender, Hannibal, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

SMITH, Presiding Judge.

Defendant appeals from his conviction by a jury of two counts of capital murder and his sentence on each count to life in prison without possibility of parole for 50 years. We affirm.

The victims of the murders were Defendant's wife, Sharon, and Walter Notheis, also known as Walter Scott, the husband of defendant's then paramour and subsequent wife, Joann. We do not find it necessary to review all of the evidence adduced at trial to determine the issues raised by defendant, including sufficiency of the evidence to support the verdicts.

Sharon Williams died on October 20, 1983. Walter Notheis disappeared on December 27, 1983, and his body was discovered April 21, 1987. Defendant met Joann Notheis in the summer of 1982 when he was doing some electrical work on her residence. Shortly thereafter they began a relationship. Both mentioned to others their desire to divorce their respective mates and the difficulties they would have in obtaining divorces on acceptable terms. The evidence was sufficient to support an inference that defendant and Joann were involved in a sexual relationship from shortly after they met and that both were interested in terminating their marriages. During this period defendant and Sharon began arguing extensively and were becoming estranged. In August 1983 defendant inquired of an employee if he knew any "hit men". The employee, believing defendant to be joking, responded "No, but do you have a job that needs to be done". Defendant said that the job paid $5,000 and had to look like an accident. He did not mention a name but stated that the man was somewhere in Minnesota at the time. Walter Notheis was a professional musician and traveled extensively with his band.

Sharon was found in her automobile in a ditch. There was evidence to support an inference that she was not driving the vehicle at the time it went into the ditch. There was evidence that there was gasoline on her body, that no rupture of the fuel tank or fuel system occurred, and that a small fire was burning in nearby wet grass at the time her automobile was discovered. On the morning after the accident defendant and his son, after being advised by the doctor that Sharon had no prospect of survival, agreed to the removal of life support systems and Sharon died. At the time it was believed she died from injuries sustained in an accident.

The funeral was held in Marion, Illinois. After it was over defendant declined to attend a reception for friends and family and accompanied by his son, returned to his home in Harvester. Prior to leaving Marion he called Joann and upon the arrival of defendant and his son at his home Joann was sitting at the kitchen table with her car in the garage. She had access to a key to defendant's home. The son left and when he returned several hours later at 7:30 p.m. Joann's car was still in the garage and when he called for defendant, defendant emerged from his bedroom in a robe. During the trip back from Marion defendant discussed with his son his ongoing relationship with Joann, advised his son that he loved her and he wanted to build a life with her and her family now that Sharon was gone. After Sharon's death, defendant spent time with Joann and her children, expressed to others his love for Joann, showed to others extensive items of clothing he had purchased for Joann, and stated to a friend that Joann's husband was an entertainer who was abusive to his family and involved in drugs and gambling and that "one day something was going to happen to Walter Scott". Joann expressed disappointment to a friend that her husband was coming home for Christmas because it meant she would not get to see defendant, but stated that defendant "had a plan".

Walter returned from Pennsylvania for Christmas. There was evidence to support an inference that on December 27 defendant followed Walter and received telephone calls from Joann as to his expected whereabouts. Walter was to pick up a battery from a garage in the evening but failed to show up. Defendant was scheduled to go bowling with his bowling team on that evening but failed to show up. Walter did not return to his home on December 27. Early morning on the 28th Joann began making inquiries of people because Walter had not returned home. Her mother-in-law told her that Joann knew it was not unusual for Walter to stay out late. Joann stated she had a "gut feeling".

At 7:30 a.m. on the 28th Joann made a missing person report to a deputy sheriff. She stated that Walter was wearing a blue jogging suit when he left for the garage. At 9:00 a.m. Joann called the music director of Walter's band, advised him that Walter was missing and asked whether they should start cancelling band jobs. Walter's parents arrived at the Notheis residence before noon on the 28th and when they arrived defendant and Joann were examining jewelry from Walter's briefcase with a magnifying glass and assessing its quality. Joann then began cancelling Walter's "gigs" which were seven weeks away. When her mother-in-law remonstrated with her Joann replied "Well, he's not coming back to do these". That afternoon Joann and defendant spoke about retrieving Walter's truck and trailer from Pennsylvania. Also that day Joann asked two friends to go to the airport and see if they could find Walter's automobile. They went and found the car. Later Joann asked them to retrieve the vehicle and defendant took them to the airport for that purpose. On the way one of the friends said he hoped they would not find anything in the car. Defendant responded "Don't worry, you are not going to find anything. He's long gone. You'll never see him again." Defendant spent that night at Joann's house. The next day after talking to Joann, the music director went to Pennsylvania to retrieve the truck, trailer, and band equipment. When he arrived defendant and Joann were already there and inquired of him if Walter had any bank accounts in other cities and where Walter kept his record books and jewelry.

Defendant told his son that he had received $210,000 from insurance policies as a result of the death of Sharon. He purchased a new car for Joann and in the spring of 1984 moved in with her. They were married in 1986. In May 1984, defendant's son got married and moved into defendant's house. In the yard there was a cistern with a concrete lid. After the son moved in defendant built a heavy planter on top of the cistern and requested that the son fill the planter with earth. When the son did not do so within a few weeks the defendant filled the planter. On April 1, 1987, the body of Sharon was exhumed following a determination by Dr. Mary Case, a pathologist, that the head injuries described in the files and records concerning Sharon's death needed to be exam-

ined more thoroughly. Following an autopsy Dr. Case determined that two wounds to the back of Sharon's head were the cause of death, that such wounds were not compatible with injuries received in the accident, and that they had been inflicted with a blunt instrument such as a crowbar. Certain bruises to the face were consistent with injuries that might be received from a car crashing into the ditch.

On April 10, 1987, the sheriff's department lifted the flower planter off the cistern at the son's residence. In the cistern they found the body of Walter Notheis, who was identified from dental records. The body was wearing a blue jogging suit and was bound by yellow rope. Defendant kept a large spool of that type of rope in the garage at the son's residence. The body was in a state of decomposition called adipocere in which the body turns to hydrolyzed fat and which occurs without bacterial action in a cool moist place. Also found in the cistern were Walter's driver's license, credit cards and other cards belonging to him. The cause of death was a bullet wound which entered from the back and went into the chest.

■ The defendant first contends that the evidence fails to establish that either death was caused by his criminal agency. Our review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found defendant guilty beyond a reasonable doubt. *State v. Dulany,* 781 S.W.2d 52 (Mo.banc 1989) [2, 3]. In determining whether the evidence is sufficient to support the jury's verdict we must accept as true all of the evidence favorable to the state, even if circumstantial, including all favorable inferences drawn from the evidence, and disregard all evidence and inferences to the contrary. *Id.; State v. Priest,* 660 S.W.2d 300 (Mo.App.1983) [4].

■ In a prosecution for homicide the state must establish every element of the offense charged including the *corpus delicti. State v. Feger,* 340 S.W.2d 716 (Mo.1960) [1, 2]. The *corpus delicti* consists of two elements, i.e., the death of a human being and the criminal agency of another in causing the death. *Id.* As to both victims, both of those elements were established. Both bodies

were recovered and identified. Dr. Case testified that death of Sharon occurred because of two blows to the back of the head by a blunt instrument. Walter's death occurred from a gunshot which entered his back and he was found bound in a cistern.

The state must further prove the criminal act of the defendant as a cause of the victim's death. *State v. Applegate,* 668 S.W.2d 624 (Mo.App.1984) [3–6]. Walter was found in a cistern on property owned and occupied by defendant at the time of Walter's disappearance. Defendant, shortly after he relinquished possession to his son, constructed over the cistern a heavy planter and filled it with dirt. It is a reasonable inference that he did so to make accidental discovery of Walter's body in the cistern virtually impossible. Knowledge of the presence of the body in the cistern would be known only to someone who was involved in killing Walter. The bindings on Walter were of the same type as kept by defendant on the premises and used by him in his business. The evidence established a motive for the killing of Walter, the mutual desire of both defendant and Joann to terminate their marriages so they could marry each other. There was evidence of statements by defendant indicating an intention to do away with Walter. The evidence indicated that immediately prior to Walter's disappearance defendant, with Joann's assistance, was following Walter. On the evening Walter disappeared, defendant did not show up for his scheduled bowling activities. The conduct of Joann and defendant in the hours immediately following Walter's disappearance indicated their knowledge that Walter was dead. While there was no direct evidence that defendant killed Walter the items of circumstantial evidence outlined above were consistent with each other and with the hypothesis of guilt and excluded every reasonable hypothesis of innocence. *State v. May,* 689 S.W.2d 732 (Mo.App.1985) [1–6]. The evidence was sufficient to support the verdict as to the death of Walter Notheis.

The evidence established a common plan or scheme by defendant and Joann to terminate their respective marriages so they could marry each other. An essential part of that

plan was the elimination of both spouses. The proving of that plan or scheme combined with Sharon having died as the result of a criminal agency combined further with the proof that defendant was the killer of Walter was sufficient to support the verdict as to the killing of Sharon Williams. The well established general rule is that proof of commission of separate and distinct crimes by the defendant is not admissible unless such proof has a legitimate tendency to establish defendant's guilt of the charge for which he is on trial. Evidence of other crimes is competent to prove the specific crime charged when it tends to establish a common plan or scheme embracing the commission of two or more crimes so related to each other that the proof of one tends to establish the other. *State v. Reese*, 364 Mo. 1221, 274 S.W.2d 304 (banc 1954) l.c. 307; *State v. Reed*, 447 S.W.2d 533 (Mo.1969). The killing of Walter as part of the common scheme or plan tends to prove defendant's criminal agency in the killing of Sharon. The evidence was sufficient to support the verdict against defendant for the killing of Sharon Williams.

■ Defendant also challenges the trial court's action in admitting statements made by Joann to others under the co-conspirator exception to the hearsay rule. Statements of one conspirator are admissible against another under the co-conspirator exception to the hearsay rule even when the conspirators are not charged with conspiracy. *State v. Leisure*, 838 S.W.2d 49 (Mo.App.1992) [9–11]. This includes statements made after the commission of a crime for the purpose of concealing the crime. *Id.* Before the statement may be introduced, the state must show the existence of the conspiracy. *Id.* at [12, 13]. The state is not required to present conclusive evidence that a conspiracy existed. *State v. Leisure*, 810 S.W.2d 560 (Mo.App. 1991) [12–14]. It is enough if the state establishes by circumstantial evidence the "appearance of acting in concert". *Id.* By their nature conspiracies are usually secretive and can seldom be shown by positive and direct testimony. Therefore, it is necessary to permit them to be shown by proof of circumstances tending to show their existence. *State v. Peak*, 68 S.W.2d 701 (Mo.1934) l.c. 705.

■ There is ample evidence that Joann and defendant were acting in concert to cause the deaths of Sharon and Walter. They were lovers; both wanted divorces but did not believe they could get one on acceptable terms; after Sharon died they began to see one another more openly; defendant called Joann after Sharon's funeral and she was at his home when he arrived from the funeral and remained for some time thereafter; on the day of Walter's disappearance Joann advised defendant of Walter's location and defendant spent the night with her; after Walter's disappearance they went together to Pennsylvania to recover Walter's property. These facts plus others discussed above sufficiently established a conspiracy.

Defendant's two remaining points involving severance and ineffective assistance of counsel are without merit. There is no precedential value in further discussion of those points. Rules 30.25(b) and 84.16(b).

Judgments affirmed.

PUDLOWSKI and WHITE, JJ., concur.