STATE of Missouri, Plaintiff–
Respondent,

v.

Daniel K. STEWART, Defendant–
Appellant.

No. 27312.

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 20, 2008.

Motion for Rehearing and Transfer to
Supreme Court Denied Sept. 17, 2008.

Application for Transfer Denied
Oct. 28, 2008.

Craig A. Johnston, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Evan J. Buchheim, Asst. Atty. Gen., Jefferson City, MO, for respondent.

JEFFREY W. BATES, Chief Judge.

Daniel Stewart (Defendant) was charged by information with committing the class A

felony of murder in the second degree. *See* § 565.021.[1] The information alleged that Defendant killed his wife, Kathy Stewart (Kathy), by asphyxiating her. A jury convicted Defendant of this offense. Jury sentencing was waived, and the court imposed a 25–year term of imprisonment.

Defendant presents four points for decision. In Point I, he contends the evidence was insufficient to convict him of second-degree murder. In Points II–IV, he contends the trial court erred by: failing to give a character instruction; not granting a mistrial because a witness mentioned that Defendant underwent a polygraph examination; and overruling an objection to testimony that constituted an impermissible comment on Defendant's invocation of his right to remain silent. Finding no merit in any of these contentions, this Court affirms.

## Point I

In Defendant's first point, he contends the trial court erred in denying his motion for judgment of acquittal at the close of all of the evidence. When reviewing the sufficiency of evidence to support a criminal conviction, this Court does not occupy the role of a super juror with veto powers over the actual fact-finders. *See State v. Grim*, 854 S.W.2d 403, 414 (Mo. banc 1993); *State v. Meuir*, 138 S.W.3d 137, 139 (Mo.App. 2004). Instead, an appellate court gives great deference to the trier of fact. *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998). The jurors who heard the evidence in this case occupied a superior position from which to assess the credibility of the witnesses and to determine the weight, value and reliability of their testimony. *See State v. Sumowski*, 794 S.W.2d 643, 645 (Mo. banc 1990); *State v. Baumann*, 217 S.W.3d 914, 917 (Mo.App.2007). Consequently, this Court accepts as true all

evidence, and the reasonable inferences drawn therefrom, tending to prove Defendant's guilt; all contrary evidence and inferences are disregarded. *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989); *State v. Cummings*, 134 S.W.3d 94, 100 (Mo.App.2004). The test is whether the evidence, so viewed, was sufficient to make a submissible case from which rational jurors could have found beyond a reasonable doubt that Defendant was guilty of the crime of second-degree murder. See *State v. Webber*, 982 S.W.2d 317, 324 (Mo.App. 1998). The evidence presented at trial has been summarized in accordance with these principles.

Defendant and Kathy married in 1985. The couple had three sons: Chris, Alex and Devon. Kathy worked as a school counselor for the Ava school district. Defendant was the co-owner of A Mustard Seed (AMS), an Ava floral business that also performed some landscaping and lawn care work.

Except for a small shared bank account, Defendant and Kathy kept their finances separate. Kathy had credit cards, bank accounts and a post office box in her name only. In addition, most of the couple's property was titled only in her name. Defendant managed his own finances through a business account. Between 2000 and 2003, Defendant's business had made very little money. To keep AMS afloat, Defendant had borrowed $5,000 to $10,000 from Kathy. Defendant was having trouble making the mortgage payments on his business while paying his share of the bills at home. Around the time of Kathy's death in May 2003, AMS was approximately $82,000 in debt and its mortgage was past due. Defendant was trying to sell a piece of property to raise funds, but the land remained unsold. When an acquain-

---

1. All references to statutes are to RSMo (2000).

tance asked Defendant whether he could borrow money from Kathy, Defendant stated that he had done that one time previously and would not do so again.

Kathy and Defendant fought frequently, and he described his marriage as "very bad." Defendant told others that he and Kathy had been pretending and that his marriage to Kathy was a lie. At various times, Defendant described Kathy as cold, indifferent and cruel. Defendant said that he wanted to leave Kathy, but he wasn't sure how he would get along on his own because everything was in her name.

May 12, 2003 was a Monday. That evening, Kathy and Defendant had a loud argument in the family home. The couple argued so loudly that their children heard it from the second and third floors of the house. Sometime during the night, Alex saw Kathy's van leave the house with its headlights off. Alex did not have a clock in his room, so he was unsure what time he saw the van leave. His estimates of the time varied from as early as 10:30 p.m. to as late as 3:00 a.m. the next morning.

On Tuesday morning, Defendant went to a gas station between 6:00 and 8:00 a.m. The attendant noticed that Defendant had a black smudge on his face. He told the attendant that he had been mowing. Sometime after Defendant left the gas station, one of his children called to say that Kathy wasn't around and to let Defendant know they needed a ride to school. On the way to school, Defendant and the children stopped at a supermarket. An employee noticed that Defendant had a black streak on the right side of his face, which hid the skin underneath it. When the employee spoke to Defendant, she noted that Defendant seemed to be talking too fast. Defendant told the clerk that he had been mowing that morning.

On Tuesday afternoon, Defendant filed a missing person report. During discussions with police, however, Defendant said Kathy would often leave for days at a time without telling anyone where she was. Defendant told police that, the last time he had seen Kathy, she was wearing her shirt and her underwear. That same afternoon, several witnesses observed a large scratch on the right side of Defendant's face. Defendant gave differing explanations of how he got scratched. In one version, Defendant said he was struck by a wire while mowing. In a second version, Defendant said he was scratched by a limb while mowing. In a third version, Defendant said he was scratched by a branch. In giving these explanations, Defendant often volunteered the information without anyone having asked him how he got scratched. Defendant stated that the scratch looked bad because Kathy was missing, and that he looked "guilty as sin." During an interview conducted after Kathy was reported missing, Alex stated that the scratch was present when he saw Defendant Tuesday morning before school. Defendant claimed he did not receive the scratch until after he had taken the children to school.

Kathy and Defendant mainly drove separate vehicles. Kathy had a van, and Defendant had a truck. One of Kathy's coworkers, Angela Ewing (Ewing), found Kathy's van in a park on Tuesday evening. Ewing drove to the Stewart home to tell Defendant that she had found the van. Defendant refused to go with Ewing to look at the van and said he did not want to be around the vehicle. Three of Defendant's hairs were later found on a rug in the van. On Wednesday morning, Ewing saw Defendant again in the school. At that time, Ewing noticed several scratches on Defendant's neck.

On either Wednesday or Thursday of that same week, Defendant went to a local tire shop to have a lawn mower re-

paired. Several employees of the tire shop noticed that Defendant's right hand was swollen. Although Defendant claimed that he injured his hand while helping the employees unload the mower, there was testimony that Defendant's hand was swollen before he touched the mower. Defendant also had an injury to his right forearm. He told an acquaintance that Kathy had inflicted the injury on him during their fight on Monday night. Multiple witnesses also noticed scratches on Defendant's neck.

Thereafter, the police took photographs of the scratches on Defendant's face, neck, right forearm, and of the injury to Defendant's right hand. An officer visited the site where Defendant claimed he had hit a wire while mowing, but no wire was found. The Stewart residence also was searched. Inside, officers found a towel with a drop of blood on it and a drop of blood on the utility room floor. Both drops of blood were matched to Defendant. Additionally, officers observed a streak about as wide as a body across one of the floors in the home. In the hallway of the house, a plate was knocked over inside a china cabinet. The house had a strong odor of bleach.

In Defendant's presence, Kathy's brother said he could forgive Defendant if he had anything to do with Kathy's disappearance or if she was killed. Defendant did not respond to that accusation. Throughout the investigation into Kathy's disappearance and the ongoing search for her, Defendant did not appear to be concerned about whether any progress was being made to find his wife. Instead, he appeared more concerned about law enforcement's focus on his relationship with Kathy and with the questions he was being asked by police. Defendant did not participate in any of the searches for Kathy. Neither did he put out any missing person fliers. At one point in the investigation, and be-

fore Kathy's body had been found, Defendant referred to Kathy in the past tense, stating, "Why would I kill her, I loved her, I mean I love her." Around that same time, Defendant also said, "You know, I know something bad's happened this time." When a police officer tried to reassure Defendant, Defendant responded that, "No, it's different this time, I know something bad's happened to her."

On Saturday, a search party consisting of over 100 volunteers and law enforcement officers was formed to look for Kathy. Defendant did not participate in the search. Several members of the party found Kathy's body by Cowskin Creek, approximately three and one-half miles away from Ava. The body was naked except for a pair of underwear on one leg. A shirt was found several feet from the body. One of Kathy's fingernails was broken, but the State was unable to find any DNA under her fingernails due to the body's decomposition. The pathologist who performed the autopsy determined that the manner of death was homicide, and Kathy's cause of death was listed as asphyxiation due to suffocation.

Defendant received a $15,000 death benefit from Kathy's employer and $1,700 per month from Kathy's retirement benefits. He also made a claim on another $15,000 life insurance policy.

■ Defendant argues that the evidence favorable to the State, coupled with all reasonable inferences which can be drawn therefrom, is insufficient to support a conviction for second-degree murder. This Court disagrees. Murder in the second degree is committed when a person "[k]nowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person[.]" § 565.021. It is irrelevant that the State's case was largely based on circumstantial

evidence. "When reviewing for sufficiency of the evidence, circumstantial evidence is afforded the same weight as direct evidence." *State v. Brooks*, 158 S.W.3d 841, 847 (Mo.App.2005). The relevant issue before this Court is whether a reasonable juror could find each of the elements of the charged crime beyond a reasonable doubt. *State v. Mishler*, 908 S.W.2d 888, 893 (Mo. App.1995).

Defendant's challenge to the sufficiency of the evidence does not specifically advise this Court which element of the crime of second-degree murder has not been adequately proven. Therefore, the point is best analyzed by resorting to the *corpus delicti* of the crime. See *State v. Applegate*, 668 S.W.2d 624, 627–28 (Mo. App.1984). The *corpus delicti* of a homicide consists of two portions: (1) the death of a human being; and (2) the criminal agency of another causing the death. *Id.* at 628; *see State v. Williams*, 897 S.W.2d 631, 634 (Mo.App.1995). These elements cannot be met unless the State has shown that the death was not accidental, self-inflicted or due to natural causes. *Applegate*, 668 S.W.2d at 628. After these elements have been met, the State must further show the defendant's criminal act was a cause of the victim's death. *Williams*, 897 S.W.2d at 634.

The State met its burden in proving the two elements of the *corpus delicti*. Kathy's body was recovered and identified, and a pathologist determined that her death was a homicide by strangulation. The State also presented sufficient evidence from which a reasonable juror could find that Defendant's criminal act was a cause of Kathy's death. Defendant had a loud argument with Kathy the night she disappeared. One of the children saw Kathy's van leaving the house without the vehicle's headlights illuminated late Monday evening or early Tuesday morning.

After Kathy's disappearance, Defendant had multiple scratches on his face, neck and arm and had sustained an injury to his hand. Defendant gave varying accounts as to how he received these injuries. For example, Defendant claimed that he injured his hand while unloading his mower, but there was testimony that the injury existed before Defendant made any attempt to unload the machine. The jury was presented with evidence that Defendant was unhappy with his marriage, fought frequently with Kathy and had a motive for killing her. It would have been financially difficult for Defendant to divorce Kathy since the majority of the couple's property was in her name, and Defendant's business was producing little or no income. Defendant filed a missing person report on Tuesday, even though he also told police that Kathy often left for days at a time without telling anyone where she went. Defendant also said that, when he last saw Kathy at home, she was only wearing a shirt and underwear. The same type of clothing was found on or near Kathy's body when it was discovered. Defendant made a number of odd and suspicious statements to witnesses and police after Kathy disappeared. For example, Defendant referred to Kathy in the past tense before she was found, and Defendant did not respond to a rather direct accusation that he was involved in Kathy's disappearance. Her body was found to have a broken fingernail. The jurors could reasonably infer that this injury occurred while Kathy resisted an attack from Defendant and that Defendant's scratches and hand injury were sustained while he strangled his wife. The jury could further infer that Kathy's van had been used to haul away her body. Viewed in a light most favorable to the verdict, the evidence and reasonable inferences derived therefrom are sufficient to sustain Defendant's

conviction for second-degree murder. Point I is denied.

### Point II

■ In Defendant's second point, he contends the trial court erred in not giving a pattern good character instruction based upon MAI–CR 3d 310.40. Defendant contends the trial court was required to give the instruction because the following evidence was introduced: (1) Kathy's co-worker testified that Kathy never said anything bad about Defendant; (2) Kathy's sister testified that she never saw Defendant display any temper in her presence, Kathy never mentioned problems in her marriage, and the relationship appeared to be a good one; and (3) Defendant testified that he was hard-working, nonviolent and had no criminal record. According to Defendant, the foregoing evidence constituted evidence of his reputation for good character traits inconsistent with the commission of murder and, therefore, required the giving of a good character instruction upon his request. This Court disagrees.

■ As the Notes on Use make clear, this instruction must be given at a defendant's request only if "evidence of reputation concerning a trait of character relevant to the issue of guilt is introduced." Notes on Use 3, MAI–CR 3d 310.40. As this Court explained in *Marschke v. State,* 185 S.W.3d 295 (Mo.App.2006):

> [E]vidence concerning a defendant's character may only be shown by testimony as to his reputation, rather than by evidence of his specific acts or conduct. In a murder case, evidence of the defendant's good reputation as a peaceable and law-abiding citizen is the only capacity in which reputation evidence is admissible as a defense to that charge.

*Id.* at 307 (Mo.App.2006) (citations omitted). This Court finds no such evidence in the record. All of the evidence cited by Defendant concerned his specific acts or conduct, rather than his general reputation in the community as a peaceable and law-abiding person. Accordingly, the trial court did not err in refusing to give a character instruction patterned upon MAI–CR 3d 310.40 due to lack of evidentiary support. *See State v. Verge,* 736 S.W.2d 423, 424 (Mo.App.1987) (involving the sufficiency of the evidence to support the giving of MAI–CR 2d 2.50, the predecessor instruction to MAI–CR 3d 310.40). Point II is denied.

### Point III

In Defendant's third point, he contends the trial court erred in not granting a mistrial because a witness mentioned that Defendant underwent a polygraph examination. The following facts are relevant to the disposition of this point.

During the investigation, Defendant underwent a polygraph examination. Officer Antonya Hampton (Officer Hampton) observed the examination. During the course thereof, Defendant was asked whether he committed the murder. He replied, "I didn't kill Kathy." Thereafter, Officer Hampton was deposed. During her deposition, she testified about the circumstances of the polygraph examination. During this portion of her deposition, she acknowledged hearing Defendant say that he didn't kill Kathy.

Prior to trial, the court granted Defendant's motion in limine to suppress any reference to "an alleged polygraph test herein, including pretest interview, test interview and post test interview." The trial court granted the motion, and the prosecution instructed its witnesses not to mention the examination during their testimony. At trial, Officer Hampton was called as a witness for the State. During her cross-examination, she gave the following testimony:

Q Was [Defendant] asked the question, "Did you kill your wife" or "Did you kill Kathy", was he ever asked that question?

A By whom?

Q Anybody.

[Objection sustained]

Q [By defense counsel] If you were present, you asked it or someone else asked it in your presence?

A Not during the investigation, no, that I was present, no.

Q Okay. Let me ask you if at page 21, line 17 on, "Listen to my question. Did you hear him say I didn't kill Kathy?" Your answer was, "Yes." Did you give that answer?

A That was for the polygraph?

At that point, defense counsel requested a mistrial. During the colloquy between counsel and the court, the prosecutor noted that Officer Hampton "was completely thrown by the question. I told her before this trial . . . they will not go into anything that happened at that polygraph or self-serving statements because this Court made an order." The trial court found that Officer Hampton did not intentionally violate the prior in limine ruling by answering the way she did. The request for a mistrial was denied, and the court gave the jury this admonition: "Ladies and gentlemen, before we resume, you are instructed to disregard the last response of the witness, it will be permanently struck from the record. You are not to speculate on the response or consider it during deliberations in any way."

▬▬▬ On appeal, Defendant contends that the trial court should have granted the request for a mistrial. A mistrial is a drastic remedy that is to be used only in extraordinary circumstances. *State v. Parker*, 886 S.W.2d 908, 922 (Mo. banc 1994). "Whether to grant a mistrial is

within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." *State ex rel. Kemper v. Vincent*, 191 S.W.3d 45, 49 (Mo. banc 2006). An appellate court will not find that a trial court abused its discretion unless its ruling was clearly against the logic of the circumstances then before the court and was so arbitrary and unreasonable as to shock the appellate court's sense of justice and indicate a lack of careful consideration. *State v. Ward*, 242 S.W.3d 698, 704 (Mo. banc 2008).

▬▬▬ As a general proposition, the results of a polygraph examination are inadmissible in Missouri criminal trials. *Kemper*, 191 S.W.3d at 49. "Even the fact that a defendant took, refused to take, or was willing to take a polygraph is inadmissible." *Id.* However, a witness' inadvertent reference to a polygraph does not by itself constitute prejudice that warrants a mistrial. *State v. Weston*, 912 S.W.2d 96, 101 (Mo.App.1995). Defendant uttered the statement that he did not kill his wife during one of the interviews surrounding his polygraph examination. As Officer Hampton's deposition testimony made clear, she only overheard this statement because she participated in those interviews. It was defense counsel who sought and obtained an in limine ruling from the court suppressing all references to the results of the polygraph examination and all of the interviews associated with it. After obtaining that ruling, however, it was defense counsel who ignored the ruling by asking Officer Hampton to divulge a statement made by Defendant during the polygraph examination. In view of the precautionary instructions Officer Hampton had received from the prosecutor, the trial court concluded that the witness was confused by defense counsel's question and that the witness' reference to the polygraph examination in her answer was inad-

vertent. Those conclusions are amply supported by the record. Therefore, the trial court did not abuse its discretion in denying Defendant's request for a mistrial. *See Weston,* 912 S.W.2d at 101; *State v. Williams,* 654 S.W.2d 215, 218 (Mo.App. 1983). Point III is denied.

### *Point IV*

In Defendant's fourth point, he contends the trial court erred by overruling an objection during an officer's testimony that constituted an impermissible comment on Defendant's invocation of his right to remain silent. The following additional facts are relevant to the disposition of this point.

Defendant was interviewed by Missouri Highway Patrol Sergeant Kirby Johnson (Sergeant Johnson) on May 16, 2003. The interview occurred on Friday, the day before Kathy's body was found. Defendant appeared voluntarily and was not under arrest, but he was read his *Miranda* rights and waived them in writing.[2] During this interview, Sergeant Johnson confronted Defendant with pictures of the scratches on his body. Sergeant Johnson told Defendant that the scratches "weren't an accident," and that Defendant had to tell him what happened. Defendant said, "I don't want to answer that question" and proceeded to fall to the floor in a fetal position. Sergeant Johnson did not ask Defendant any more questions, and he remained in a fetal position for several minutes. When Sergeant Johnson told Defendant that he couldn't leave until he signed out, he opened his eyes, got up, walked over to the table and signed out.

■ At trial, Sergeant Johnson testified about Defendant's voluntary participation in the interview. During Sergeant Johnson's direct examination, he gave the following testimony:

Q Did you ask [Defendant] any additional questions about his injuries?

A At one point I confronted him in the conversation about the injuries.

Q What did you say to him?

A I made the comment to him in fact I showed him two pictures that had been given to me by the Sheriff [of Douglas County], showing the facial injuries, similar to the one that you showed me and I made the comment to him, "Dan, these weren't an accident, you've got to tell me what happened."

Q What was his comment?

A He merely stated, "I don't want to answer that question" and he pitched down in the floor in a fetal position and—

At that point, defense counsel objected. Counsel argued that the witness' recital of Defendant's statement that he didn't want to answer "that question" should be stricken because said testimony constituted an impermissible comment on Defendant's Fifth Amendment right not to incriminate himself. The trial court overruled the objection and denied the motion to strike.

■ On appeal, Defendant contends that the trial court's ruling was erroneous. We need not decide that question, however, to dispose of this allegation of error. Before Sergeant Johnson testified, Douglas County Sheriff Gary Koop (Sheriff Koop) was called as a witness by the State. During Sheriff Koop's redirect and re-cross-examinations, he gave the following testimony:

FURTHER REDIRECT EXAMINATION by [prosecutor]:

Q On Friday, June [sic] 16th, [Defendant] refused to answer any more

---

**2.** *See Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

questions, is that correct, when Kirby Johnson was questioning him?

A  He refused to answer a question.

FURTHER  RECROSS–EXAMINATION by [defense counsel]:

Q  On Friday, June [sic] 16th he was crying and lying on the floor, is that what you understand from your reports?  Is that what you think means refusing to answer a question?

A  I said he refused to answer a question.

The information adduced from Sheriff Koop was admitted without objection and provided the jury with the very same information later elicited from Sergeant Johnson.  "When evidence challenged on constitutional grounds is cumulative of other properly-admitted evidence, the disputed evidence could not have contributed to the defendant's conviction and is harmless beyond a reasonable doubt."  *State v. Lopez,* 128 S.W.3d 195, 202 (Mo.App.2004); *see State v. Fuente,* 871 S.W.2d 438, 443–44 (Mo. banc 1994); *State v. Clark,* 26 S.W.3d 448, 458 (Mo.App.2000); *State v. Duncan,* 945 S.W.2d 643, 648–49 (Mo.App. 1997); *State v. Schwendt,* 645 S.W.2d 385, 386–87 (Mo.App.1983).  Point IV is denied.

The judgment of the trial court is affirmed.

LYNCH and BURRELL, JJ., Concur.